CLEARVIEW CONCRETE PRODUCTS CORP., Respondent, v S. CHARLES GHERARDI, INC., Defendant and Third-Party Plaintiff-Appellant, et al., Defendants. CLEARVIEW CONCRETE PRODUCTS CORP. et al., Third-Party Defendants-Respondents. (Action No. 1.)

JAMES J. DUFFY et al., Respondents, v MANORVILLE ESTATES et al., Defendants and Third-Party Plaintiffs-Appellants, et al., Defendants. ANDREW DeLILLO, Third-Party Defendant-Respondent. (Action No. 2.)

Second Department, August 30, 1982

APPEARANCES OF COUNSEL

*Cadwalader, Wickersham & Taft* (*Sarah G. Anderson* of counsel), for appellants.

*Suozzi, English & Cianciulli, P. C.* (*Jeffrey G. Stark* of counsel), for respondents in Action No. 2.

*Field, Lomenzo & Turret, P. C.* (*David A. Field* and *Ira A. Turret* of counsel), for Clearview Concrete Products Corp. and another, respondents.

OPINION OF THE COURT

· LAZER, J.

██ The plaintiffs in these two consolidated foreclosure actions are the trustees of the Pension and Retirement Benefit Fund, Locals 138, 138A and 138B, International Union of Operating Engineers (the Fund), which holds a first mortgage on a 500-acre parcel of land in Manorville, and Clearview Concrete Products Corp. (Clearview), the holder of a second mortgage on the same property. The property owner, Manorville Estates, a limited partnership, and its general partner, S. Charles Gherardi, Inc. (jointly referred to here as Manorville),[1] have asserted the defense of unclean hands and counterclaimed for rescission of both mortgages alleging fraudulent concealment of an acceleration provision in two unrecorded instruments which modified and extended the Fund's mortgage. In further causes of action, Manorville seeks damages against Clearview and its principal, Andrew DeLillo, for fraud and breach of warranty. After a lengthy trial, Special Term dismissed the counterclaims and decreed foreclosure of both mortgages. On this appeal, we conclude that Manorville is not entitled to relief against the Fund because it has failed to prove the latter's participation in any fraudulent scheme. As to the second mortgage, the right to rescind was waived by Manorville's ratification of the entire transaction after discovery of the fraud. Although the ratification did not extinguish Manorville's claims for monetary damages, the

---

1. Although the deed from Clearview listed S. Charles Gherardi, Inc., as the grantee, the record indicates the purchase was made on behalf of the partnership.

record supports an award of nothing more than nominal damages.

I

Manorville's defenses and claims emanate from the circumstances surrounding its December, 1972 purchase of the acreage from Clearview which, in turn, had previously acquired it from the Fund. The original terms of the Fund's purchase-money mortgage from Clearview required a substantial payment of principal on July 1, 1971, but shortly before that date the Fund agreed to defer the July payment until October in return for the right to accelerate the entire principal sum should the property be conveyed. Although the instruments containing these modifications of the Fund's mortgage were not recorded, a recorded assignment of that mortgage contained a reference to them. At its closing with Clearview on December 21, 1972, Manorville was thus aware that modification agreements existed but was unaware of their contents. To induce Manorville to close title in the face of unknown mortgage provisions, Clearview denied the agreements existed, threatened cancellation of the purchase contract, and furnished Manorville with an affidavit in which Clearview's president, DeLillo, averred: "Clearview is not a party to any extension or modification agreement and most especially the extension and modification agreements recited in an assignment of mortgage dated March 3, 1972 and recorded July 5, 1972 in Liber 6405 Mp 370."

Manorville accepted the representation and title closed.

Knowledge of the falsity of DeLillo's affidavit came to Manorville quickly for, within a few weeks, it received copies of the unrecorded agreements. The Fund's reaction to the sale was prompt: it exercised its right to accelerate payment of the principal and commenced a foreclosure action against Clearview, adding Manorville as a defendant a few months later.[2]

Although that foreclosure action was subsequently discontinued without prejudice, Manorville made no effort to avoid the mortgage it had given Clearview or to disavow the purchase transaction in general. It proceeded, instead,

2. The party actually named was Manorville's general partner, S. Charles Gherardi, Inc.

to bargain with Stirling Homex Corporation for the purchase of modular homes to be installed on the land, filed a subdivision plan with the Brookhaven Planning Board, paid property taxes and interest on both mortgages, and sought financing for its development scheme. It was not until late 1974, almost two years after discovery of the fraud, that Manorville defaulted on its payments of mortgage installments and real estate taxes. These foreclosure actions resulted.

■ Answering the complaints, Manorville pleaded unclean hands, demanded rescission of the mortgages, and sought damages for fraud and breach of warranty allegedly committed by Clearview and DeLillo. In its appellate posture, Manorville posits that equitable estoppel[3] should defeat foreclosure of the first mortgage because the Fund's failure to record the extension and modification agreements enabled Clearview to perpetrate the fraud. There is nothing in the record, however, to establish that the Fund's failure to record was intended to defraud Manorville or that the failure breached any duty of the Fund to Manorville. Manorville's omission to make further inquiry concerning the unrecorded agreements, its acceptance of DeLillo's affidavit as a substitute for inquiry, the affirmance of the purchase, and the absence of any evidence of connivance by the Fund, have vitiated any potential defense against the Fund's foreclosure. We turn, then, to the action to foreclose the second mortgage and Manorville's counterclaims against Clearview and DeLillo.

## II

Focusing on the effects of DeLillo's fraudulent misrepresentation, Manorville asserts that its efforts to obtain necessary financing for development and carriage of the property were blocked by the existence of the acceleration clause. Proof of this contention was based, in part, upon a plan Manorville proposed to the Bowery Savings Bank to have the latter buy the property, subject to both mortgages, and then lease it back. Presented in February, 1973, the proposal eventually was withdrawn by Manorville without any action upon it by the bank.

---

3. Only unclean hands received mention in its answers and during the trial.

In June, 1973 the Brookhaven Planning Board rejected a subdivision plat submitted by Manorville under the existing half-acre zoning requirements. In August, with the express purpose of restraining development that might impair the effectiveness of its forthcoming master plan, the Brookhaven Town Board adopted a moratorium prohibiting approval of plats containing lots of less than one acre. Later in 1973, a preliminary plat containing one-acre lots submitted by Manorville was informally rejected by the planning board as too ambitious. Originally scheduled to endure for a single year, the subdivision moratorium was extended until May, 1975, when the town implemented the changes recommended in its master plan by rezoning Manorville's property to a two-acre category. No formal plan complying with the moratorium was ever developed by Manorville.

In January, 1975 Manorville also failed in an attempt to induce the Long Island Bank to extend Clearview's mortgage which that institution was holding as collateral. Conversing with an officer of the bank, a principal of Manorville's general partner, James Gherardi, blamed the moratorium and the weak housing market for the company's failure to develop the property. The record does not indicate that Manorville's failure to obtain the Long Island Bank extension or the withdrawal of Manorville's proposition to the Bowery Savings Bank were influenced by the Fund's right to accelerate.

The moratorium and the housing market also were the reasons for nondevelopment Mr. Gherardi gave the limited partners in a letter written before the ill-fated effort to obtain succor from the Long Island Bank. To similar effect, Manorville's real estate broker testified that his conversations with Mr. Gherardi in 1974 centered on the moratorium and the difficulties it created for development of the property. While it is unclear whether, prior to its defaults, Manorville knew that the Brookhaven master plan had recommended two-acre zoning for the property or whether the town board was disposed to act favorably on the recommendation, it is apparent that the moratorium, conditions in the housing market, and Manorville's inability to obtain additional financing, triggered its financial collapse, with-

out any demonstrated relationship to the unrecorded extension and modification agreements.

## III

■ With this historical backdrop, we return to the legal issues. The rescission question is simply disposed of. Manorville abandoned its rescission rights when — cognizant of the fraud — it accepted the benefits of the contract and thereby affirmed it (see *New York Tel. Co. v Jamestown Tel. Corp.,* 282 NY 365; *Big Top Stores v Ardsley Top Shoppe,* 64 Misc 2d 894, affd 36 AD2d 582). Retention of the benefits was entirely inconsistent with the disaffirmance counterclaims, for it established Manorville's willingness to permit the transaction to stand (see *Brennan v National Equit. Inv. Co.,* 247 NY 486; Restatement, Contracts 2d, § 380; 12 Williston, Contracts [3d ed], § 1527). The unavailability of the rescission remedy vitiates, as well, the right to recover damages collateral to rescission.[4] Affirmance and retention of the property frustrates recovery both of acquisition costs (see *Nelvan Constr. Corp. v Sanka Realty Corp.,* 227 App Div 51; Restatement, Contracts 2d, § 376; 12 Williston, Contracts [3d ed], § 1527) and carrying charges (see *Johnson v Heidenfelder,* 195 NYS 73; Dobbs, Law of Remedies, § 9.2; cf. *Cowart v Lang,* 252 App Div 720). Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud (see *Goldsmith v National Container Corp.,* 287 NY 438; *Pryor v Foster,* 130 NY 171; *Vail v Reynolds,* 118 NY 297). He may not, however, affirm the transaction, keep the property and at the same time recover the costs of acquiring and maintaining it.

## IV

Affirmance does not of itself, however, either waive recovery of fraud damages or deprive the victimized party

---

4. According to Manorville, these include the down payment, incidental acquisition costs such as title insurance, legal fees and the broker's commission paid pursuant to the contract, plus closing adjustments such as mortgage interest and real estate taxes. Damages consequential to the fraud and breach of warranty are asserted to be development costs, including engineering, architectural, accounting and other services plus lost profits. Manorville totals its damages at $8,986,341.

of the ability to achieve compensation for the aftermath of the fraud (see *Vail v Reynolds,* 118 NY 297, *supra; Byrnes v National Union Ins. Co.,* 34 AD2d 872; *Towers Realty Corp. v Fox,* 278 App Div 74; *Urdang v Posner,* 220 App Div 609, affd 247 NY 565; *Potts v Lambie,* 138 App Div 144), for the common-law fraud action proceeds upon affirmance of the contract (see *Goldsmith v National Container Corp.,* 287 NY 438, *supra; Wood v Dudley,* 188 App Div 136; 3 Black, Rescission of Contracts and Cancellation of Written Instruments [2d ed], § 561).

In an action to recover fraud damages, the plaintiff must prove: (1) a misrepresentation of fact, (2) which was false and known to be false by the defendant, (3) that the representation was made for the purpose of inducing the other party to rely upon it, (4) the other party justifiably did so rely, (5) causing injury (see *Channel Master Corp. v Aluminum Ltd. Sales,* 4 NY2d 403; *Roney v Janis,* 77 AD2d 555; *Brown v Lockwood,* 76 AD2d 721; Restatement, Torts 2d, § 525; 24 NY Jur, Fraud and Deceit, § 14). Evaluating the record against these criteria, we conclude, as did Special Term, that Clearview and DeLillo[5] perpetrated a fraud upon Manorville. Nominal damages are the limits of Manorville's recovery, however.

The prime standard for measuring the actual pecuniary loss sustained as a direct result of fraud is the "out of pocket" rule (see *Hanlon v Macfadden Pub.,* 302 NY 502; *Reno v Bull,* 226 NY 546; PJI 3:20; see, generally, Ann., 13 ALR3d 875). Under the rule, the loss is computed by ascertaining the difference between the consideration paid for the property and its actual value as affected by the consequences of the fraud (*Reno v Bull, supra; Ochs v Woods,* 221 NY 335; *Urtz v New York Cent. & Hudson Riv. R.R. Co.,* 202 NY 170; *Morris v Lewis,* 75 AD2d 844). Since Manorville proffered no evidence concerning the

---

5. As president of Clearview and the signer of the affidavit, DeLillo would be personally liable for fraud, even though the misrepresentation occurred on behalf of his principal, and even though he did not have a personal interest in the transaction (see *Laska v Harris,* 215 NY 554; *Taylor v Cowit,* 20 AD2d 699; *Kathleen Foley, Inc. v Gulf Oil Corp.,* 12 AD2d 644, affd 10 NY2d 859; *Schechner-Wittner, Inc. v White Organization,* 138 Misc 768; Restatement, Agency 2d, § 348; 3 NY Jur 2d, Agency and Independent Contractors, § 289).

actual value of the property as affected by the offending acceleration provision, "out of pocket" damages have not been proven.

Recovery of profits which would have been realized in the absence of fraud is not possible under the "out of pocket" theory (*Dress Shirt Sales v Hotel Martinique Assoc.,* 12 NY2d 339; *Foster v Di Paolo,* 236 NY 132; *Ungewitter v Toch,* 31 AD2d 583, affd 26 NY2d 687; *Skrine v Staiman,* 30 AD2d 707, affd 23 NY2d 946) because the defrauded party is entitled solely to recovery of the sum necessary for restoration to the position occupied before the commission of the fraud (*Sager v Friedman,* 270 NY 472, 481; Ann., 13 ALR3d 875, 883).

"Out of pocket" considerations do not, however, prevent recovery of other consequential damages proximately caused by reliance upon the misrepresentation (see *Hotaling v Leach & Co.,* 247 NY 84; *Mills Studio v Chenango Val. Realty Corp.,* 15 AD2d 138; Restatement, Torts 2d, § 549, subd [1], par [b]). Had Manorville been able to demonstrate that its reliance on the false representation resulted in expenditures which would not otherwise have been incurred, recovery of those expenditures would not have been barred (see, e.g., *Werblud v Mehadrin Dairy Corp.,* 11 Misc 2d 167; see, also, Restatement, Torts 2d, § 549, comment *d;* Dobbs, Law of Remedies, § 9.2, p 598). With reliance the key element for such recovery, only prediscovery expenses can be recaptured since expenses incurred after discovery have no root in reliance (see *Strouth v Wilkison,* 302 Minn 297; *Lowrey v Dingmann,* 251 Minn 124; Restatement, Torts 2d, § 549, comment *e;* 3 Black, Rescission of Contracts and Cancellation of Written Instruments [2d ed], § 561; 37 CJS, Fraud, § 141, subd e), unless they are based on an obligation which predates discovery. Once Manorville affirmed, recovery of the sums it spent subsequent to the affirmance was beyond reach because the disbursements had no derivation in reliance on the misrepresentation.

## V

Manorville's final grasp at recovery is founded on breach of warranty. DeLillo's affidavit is a warranty because it constitutes an assurance of the existence of a fact which

induced the bargain (see *Ainger v Michigan Gen. Corp.,* 476 F Supp 1209, 1220, affd 632 F2d 1025; *Metropolitan Coal Co. v Howard,* 155 F2d 780; 12 Williston, Contracts [3d ed], § 1505). Breach of warranty damages are usually measured by the "benefit of the bargain" rule, i.e., the difference between the actual value of the property and the value which it would have had absent the breach (*Sager v Friedman,* 270 NY 472, 481, *supra; Gleason v Lebolt & Co.,* 223 App Div 46; 12 Williston, Contracts [3d ed], § 1514; Ann., 13 ALR3d 875, 883).

The "benefit of the bargain" standard is intended to place the injured party in as good a position as would have been achieved had there been full performance of the contract, but the damages claimed must be measurable with a reasonable degree of certainty and must be adequately proven (*Freund v Washington Sq. Press,* 34 NY2d 379; *Wakeman v Wheeler & Wilson Mfg. Co.,* 101 NY 205; Restatement, Contracts 2d, § 352; 5 Corbin, Contracts, § 1022). Loss of the "bargain" may include loss of profits that would have resulted from the transaction had there been no breach of warranty (*Sager v Friedman, supra; R&I Electronics v Neuman,* 66 AD2d 836; *Robert T. Donaldson, Inc. v Aggregate Surfacing Corp. of Amer.,* 47 AD2d 852, app dsmd 37 NY2d 793). In addition to damages which flow from loss of the bargain, other damages which are the natural and direct result of the breach, and which were in the contemplation of the parties, may be recovered (see *Ellen v Heacock,* 247 App Div 476; *Bonwit Teller & Co. of Philadelphia v Staub Furs,* 208 Misc 589; see, also, Restatement, Contracts 2d, § 347).

As we have previously noted, Manorville offered no evidence to establish the actual value of the property as affected by the acceleration clause or what the property would have been worth if unaffected by the clause. The record is thus barren of evidence of "benefit of the bargain" damages (see *Brown v Lockwood,* 76 AD2d 721, 743, *supra;* 11 Williston, Contracts [3d ed], § 1345; Dobbs, Law of Remedies, § 12.3) and if potential profits were lost or other damages suffered, they too are beyond recovery for they constitute the upshot of intervening causes and not the breach of warranty.

Notwithstanding its failure to establish damages, Manorville is still entitled to nominal damages to vindicate its rights deriving from the fraud and breach of warranty practiced upon it (see, generally, Dobbs, Law of Remedies, § 3.8, p 191). The transaction having been fraudulently induced (see *Jo Ann Homes at Bellmore v Dworetz,* 25 NY2d 112; *Ochs v Woods,* 221 NY 335, *supra*), Clearview and DeLillo are liable to pay nominal damages without a showing of actual damages (see *Pryor v Foster,* 130 NY 171, 178, *supra; Northrop v Hill,* 57 NY 351; *McVea v George,* 214 App Div 807; *Seidman v Bandes,* 74 NYS2d 883; *Gluck v Hotchner,* 176 NYS 756; 24 NY Jur, Fraud and Deceit, § 258). Manorville also is entitled, as a matter of law, to an award of nominal damages for breach of warranty (see *Freund v Washington Sq. Press,* 34 NY2d 379, *supra; Manhattan Sav. Inst. v Gottfried Baking Co.,* 286 NY 398; *Katz v Pacific Bank,* 212 App Div 601; Restatement, Contracts 2d, § 346, subd [2]; 13 NY Jur, Damages, § 6).

Accordingly, the judgment should be modified to the extent of awarding judgment to Manorville on its counterclaims against Clearview and DeLillo in the amount of $1. As so modified, the judgment should be affirmed, with one bill of costs payable to the Fund by Manorville, and with one bill of costs to Manorville to be paid jointly by Clearview and DeLillo.

TITONE, J. P., NIEHOFF and RUBIN, JJ., concur.

Appeal from an "order of reference and interlocutory judgment of foreclosure" of the Supreme Court, Suffolk County, dated June 5, 1980, dismissed (see *Matter of Aho,* 39 NY2d 241, 248).

Judgment of the same court, entered October 6, 1981, modified, on the law, to the extent of awarding judgment to Manorville Estates and S. Charles Gherardi, Inc., on their counterclaims against Clearview Concrete Products Corp. and Andrew DeLillo in the amount of $1. As so modified, judgment affirmed. The order dated June 5, 1980 is modified accordingly.

The trustees of the Pension and Retirement Benefit Fund, Locals 138, 138A and 138B, International Union of Operating Engineers are awarded one bill of costs payable

by Manorville Estates and S. Charles Gherardi, Inc., and Manorville and Gherardi are awarded one bill of costs payable by Clearview Concrete Products Corp. and Andrew DeLillo.