The FALLER GROUP, INC., Plaintiff,

v.

Matthew JAFFE, et al., Defendants.

Matthew JAFFE, Plaintiff,

v.

FALLER INDUSTRIES, INC., et al., Defendants.

Nos. 82 Civ. 0907 (PNL), 82 Civ. 0939 (PNL).

United States District Court, S.D. New York.

May 9, 1983.

Shea & Gould by Ralph Ellis and David Pikus, New York City, for Matthew Jaffe.

Paul, Weiss, Rifkind, Wharton & Garrison by Jay Greenfield, Allan J. Arffa and Earl H. Doppelt, New York City, for Faller Group.

Dewey, Ballantine, Busby, Palmer & Wood by Robert C. Myers and Saul P. Morgenstern, New York City, for Great-West Life Assur. Co.

## OPINION AND ORDER

LEVAL, District Judge.

These are causes of action for fraud and counterclaims for breach of contract in connection with the purchase by plaintiff The Faller Group, Inc. from defendant Matthew Jaffe of companies engaged in aspects of the insurance business (the "Jaffe Companies"). The jurisdiction of the federal courts is appropriately based on the federal securities laws and diversity of citizenship.

The gist of the Faller claims is that Jaffe fraudulently concealed an investigation which was being conducted by the New York State Department of Insurance into excessive fees charged by the Jaffe Companies, which investigation later resulted in reduction of the fees and serious financial detriment to the companies. Jaffe counter-

claims that the Faller Group breached its obligations under his employment contract by dismissing him.

## FALLER'S FRAUD CLAIMS

Prior to the purchase of the Jaffe Companies, Gerald (Bud) Faller had been a successful employee and salesman for the Great-West Life Assurance Company ("Great West"). Through his work Faller had become acquainted with Matt Jaffe, who, together with his brother Dan Jaffe, owned companies engaged in "third party administration" of group insurance policies. A third party administrator (TPA) does administrative work, processing and payment of claims and record-keeping for the underwriter. Such third party administrators are characteristically paid fees by the underwriter which are calculated as a percentage of the premiums on the policies being administered.

The customers of the Jaffe Companies were primarily labor union health and welfare plans. Much of the insurance of these customers was placed by the Jaffe Companies with Trans-World Life Insurance Company, for which the Jaffe Companies performed TPA services. The Jaffe Companies had been very successful and by February, 1979 had accumulated earnings of approximately $6½ million which were held in certificates of deposit.

In late 1977 Bud Faller entered into negotiations to buy the Jaffe Companies. Faller was interested in making an entrepreneurial venture. Jaffe was interested in selling the companies, in part because the accumulated $6½ million could not be distributed as dividends without incurring very high income tax liabilities and could not be held indefinitely as idle funds without risking imposition of an Accumulated Earnings Tax. See I.R.C. §§ 531–37.

Jaffe, however, had another reason to be interested in selling. The Insurance Department of the State of New York was engaged, during the period of the negotiations with Faller, in an investigation which threatened the Jaffe Companies with substantial potential liabilities and a severe diminution in revenues.

As noted above, the Jaffe Companies had placed a very large part of their customers' insurance with Trans-World and performed third party administration services for Trans-World on those accounts. The two Jaffe Companies primarily involved in this work were Fringe Plan Administrators, Ltd. and Group Writers, Inc. These Jaffe Companies received fees from Trans-World aggregating approximately 9½% of Trans-World's premiums on this business. These fees constituted the major part of the Jaffe Companies' revenues. The Insurance Department's investigation centered on Trans-World and its relationship with Group Writers and Fringe Plan. It was premised on the view that Trans-World was charging unreasonably high retentions (the retention being the difference between premiums collected and sums paid out for claims) and, as a part of its excessive retentions, was paying excessive third-party administration fees to Fringe Plan and Group Writers.

The fact of this investigation was well known to Matt Jaffe long prior to the sale of the Jaffe Companies on February 16, 1979. Over a year earlier Jaffe had written to a minority shareholder to the effect that the Insurance Department's actions "could result in large and substantial retroactive refunds of fees paid to Fringe Plan Administrators, Ltd. over the past several years." Jaffe had kept himself advised during 1978 and early 1979 of Trans-World's meetings and correspondence with the Insurance Department. He caused an employee to prepare a report for submission to the Insurance Department which sought to justify the TPA fees being charged.

On January 2, 1979, Sidney B. Glaser, Associate Counsel of the Insurance Department was formally appointed and authorized to proceed with an investigation into the affairs of Trans-World, Fringe Plan and Group Writers. Glaser telephoned the Jaffe Companies on January 23, 1978 to arrange a date for Matt Jaffe to testify. On January 25, Jaffe called Glaser to arrange such a date. Shortly thereafter

Jaffe's nephew and in-house counsel Barry Chaifetz telephoned Glaser to discuss Jaffe's appearance. On February 2, 1979, Jaffe met with the President of Trans-World, discussed the investigation and requested copies of the Insurance Department's order of investigation and subpoena, which expressly named Group Writers and Fringe Plan as subjects of the investigation. Jaffe received a copy of the requested documents sometime before February 6, 1979. On February 13, only three days before the sale of the Jaffe Companies, Chaifetz and Jaffe's consultant Solomon Bendet met with Mr. Glaser. Glaser discussed with Chaifetz and Bendet the nature of the investigation into the fees of Group Writers and Fringe Plan and delivered to them a copy of the formal authorization.

By this and other evidence, it is overwhelmingly established that Jaffe was fully aware of the investigation into the Jaffe Companies. Faller, on the other hand, was unaware of the investigation and unaware of any threat to the continuation of Trans-World's service fees at 9½%.

Jaffe took steps to prevent Bud Faller from finding out about the investigation. He suggested to Faller, in the interests of discretion, that Faller not talk to Trans-World about the proposed acquisition. Furthermore, in the fall of 1978, Faller's employer (and prospective financier) Great West was discussing the possibility of purchasing Trans-World. In connection with that possibility, George Dinney of Great West visited Matt Jaffe. When Dinney asked Jaffe whether it would be advisable for him to visit the New York Insurance Department to see how receptive it would be to Great West's entry into New York through the Trans-World acquisition, Jaffe counseled Dinney against such an approach.

Jaffe's draft agreement with Faller, which was in negotiation throughout this period, contained a representation and warranty that "to the knowledge of the Sellers [Jaffe and his brother], there is no ... investigation before or by any governmental ... authority pending or threatened against or affecting any of the Jaffe Com-

panies ... or affairs of any of the Jaffe Companies". On one of the copies of the draft in the Jaffe Company files, in the margin next to the text of this warranty someone had written, "other than TW matter."

On February 16, 1979, the purchase and sale agreement was signed and closed. It contained in paragraph 3.18 (Exh. F 69) the above-quoted assurance that there were no known investigations, and made no reference to the Insurance Department investigation.

This was a willful fraudulent misrepresentation of a material fact and a false warranty.

The materiality of the false representation is not open to dispute. The Trans-World policies were the principal source of the Jaffe Companies' income. The investigation pointed towards a mandatory reduction of those fees. Such a reduction necessarily would have a significant impact on the income and value of the Jaffe Companies.

Five days after the closing, on February 21, 1979, a subpoena was served by the Insurance Department on Matthew Jaffe by one Murray Zaroff, an insurance department official. Jaffe contrived to obtain from Zaroff an affidavit to the effect that the service of the subpoena on that date constituted the "first official notice" of the investigation. There was evidence of the existence of a relationship between Jaffe and Zaroff. The affidavit which Zaroff obligingly delivered constituted no more than a sham contrivance on Jaffe's part to attempt to paper over his false representation.

The consequences of the investigation turned out to be quite serious. The fees received by Fringe Plan and Group Writers were reduced from 9½% to approximately 6%, which resulted in a serious drop in earnings. The companies made a refund to Trans-World of $197,000; and the Jaffes personally paid $400,000 as a settlement. Also an investigation was opened by the United States Department of Labor which

has required a $50,000 payment and remains unresolved.

■ Jaffe asserts several defenses to the fraud claim, none of which has merit. He argues that Bud Faller and Great West were joint venturers in this investment as a means through which Great West could penetrate the New York market. Seen in this light, he contends that the investigation was of minimal significance to Faller and Great West, and therefore was not material. He contends further that Great West had become aware of the Insurance Department investigation when it earlier explored the possible acquisition of Trans-World. He contends that Great West transmitted this information to Faller, and that even if it did not, Faller is chargeable with Great West's knowledge since they were engaged in a joint venture. Finally, Jaffe contends that if Faller did not know of the investigation, his ignorance was attributable to his negligent failure to use due diligence, or recklessness, and he is therefore barred from recovery.

These contentions have no merit. The evidence established that Faller was buying the Jaffe Companies as a profit motivated business venture for himself, and not as an advance scout for Great West. Although the purchase was financed by a $6.5 million loan from Great West which was to be promptly repaid when the Jaffe Companies' certificates of deposit matured, Faller executed very substantial personal guarantees to cover payment of the companies' tax liabilities and acquired 70% of the common stock. He was not acting as Great West's agent in the transaction. Jaffe has failed to show that Great West knew of the Insurance Department investigation. It is true that Great West explored the possibility of buying Trans-World. It eventually dropped its interest. There is no proof that Great West learned of the investigation during this time. Indeed, the proof shows that Jaffe dissuaded Great West's representative from visiting the Insurance Department.

■ As to the contention that Faller failed to exercise due care, Jaffe essentially argues that anyone who was fool enough to accept his representation and warranty at face value is not entitled to protection from his fraud. While it might have been more prudent for Faller to check with the Insurance Department and with every appropriate regulatory or prosecuting agency to determine whether any investigations or prosecutions might affect the companies, his failure to do so in reliance on Jaffe's warranty did not constitute carelessness of a type or degree that would bar his action based on Jaffe's fraud. He was entitled to accept and rely on Jaffe's warranty and to sue for damages. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

Jaffe has failed to make out any defense to the fraud claims against him.

### JAFFE'S BREACH OF CONTRACT CLAIMS

The agreement for the sale of the Jaffe Companies was expressed in companion contracts: a "Sale and Purchase of Stock" agreement which stated a purchase price of $6½ million (Exh. F 69) and "Employment Agreements" for Matt and Dan Jaffe. (Exh. F 70). The employment contracts provided that Matt and Dan Jaffe would each receive an annual salary of $150,000 with substantial additional benefits, and provided further for the payment to each of the Jaffes of a "performance salary" of $200,000 per year for five years contingent on the earnings of the companies. The employment agreements provided that neither Jaffe could be terminated during the term of the agreement except for "good cause" and defined "good cause" as "a proven act of dishonesty leading to an actual criminal conviction for such act." The agreements allowed for liquidated damages in the event of a termination without "good cause."

In February of 1982, the Faller Group initiated this litigation seeking, among other things, a declaration that it had no obli-

gation to Jaffe under the Employment Agreement because Jaffe had allegedly procured the agreement through certain fraudulent misrepresentations. At the same time, the Faller Group delivered a letter to Jaffe, informing him of the litigation and asking him not to come to the companies' offices or to represent himself as an employee of the companies. The Faller Group ceased making payments to Jaffe at that time.

Jaffe contends on three theories that he could not lawfully be fired and sues to recover his lost pay and benefits.

Jaffe's first theory is that he did nothing wrong. As indicated above, the evidence conclusively demonstrates that Jaffe fraudulently induced Faller to enter into the purchase and sale agreement. I find as a matter of fact that the fraud tainted the employment agreement, which was a part of the purchase and sale agreement.

His second theory is that the terms of his employment contract protected him from dismissal, except upon a criminal conviction. Although the evidence would support a criminal conviction, the contract terms require an actual conviction and are not satisfied by a constructive conviction. I need not determine, however, whether the contractual requirement is void as against public policy because under New York law fraudulent inducement is a complete defense to a claim brought under a contract. *See, e.g., Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779 (2nd Cir.1978); *New York Yellow Pages, Inc. v. Growth Personnel Agency, Inc.,* 98 Misc.2d 541, 414 N.Y.S.2d 260 (1979). Even if the absence of a criminal conviction would bar Faller from terminating Jaffe *under the contract,* this has no bearing on Faller's contention that the contract is void by reason of Jaffe's fraudulent inducement. *Jaffe v. Faller,* 82 Civ. 939, Slip op. at 3 (Sept. 22, 1982). Since the contract was induced by Jaffe's fraud, Faller may disavow it.

Nevertheless, Jaffe asserts as his third argument that, having chosen to enforce the contract by an action for damages rather than rescission, Faller may not pick and choose among its provisions, enforcing those terms advantageous to him and rescinding the rest.

It is true that classical doctrine required a defrauded purchaser to elect whether he would enforce the contract and sue for damages, or disavow the contract. *See, e.g., Merry Realty Co. v. Shamokin & Hollis Real Estate Co.,* 230 N.Y. 316, 323, 130 N.E. 306 (1921) ("If rescission is the remedy selected it must be in whole and not in part. If there be an affirmance it must be of all the terms and conditions of the contract.") This doctrine protected against double recovery which would occur if, for an extreme example, a buyer were permitted to disavow his contractual obligation to pay but enforce the seller's obligation to deliver.

More recently it has been recognized in New York statutory and decisional law that circumstances arise which justify the simultaneous use of both remedies. *See Ripley v. International Rys. of Central Americas,* 8 N.Y.2d 430, 437–38, 209 N.Y.S.2d 289, 292–93, 171 N.E.2d 443, 445 (1960); N.Y.C.P.L.R. § 3002(e) (McKinney's 1974). Substantial unfairness can result to the defrauded party in requiring him to elect. The facts of this case present an excellent example of an appropriate instance to permit the buyer to retain his purchase, claiming damages for the fraud, but relieve him of the contractual obligation to employ the defrauding seller. It would be a serious and unjustifiable unfairness to the defrauded buyer of a business to require him to keep in his employ the seller who defrauded him unless he agrees to give up the benefit of what he purchased. *Of course, a court must exercise care to insure that the bifurcation of remedies does not unfairly multiply the value of the remedy.*

I conclude it is appropriate, by reason of Jaffe's fraud in inducing Faller to enter into the contract, to relieve the Faller Group of its obligation to keep Jaffe in its employ. In this case, the obligation to employ Jaffe and pay him wages (and fringe benefits) is fairly separable from the contract for the purchase of the companies.

See *Ripley v. International Rys. of Central America, supra,* 8 N.Y.2d at 437, 209 N.Y. S.2d at 292–93, 171 N.E.2d at 445 ("[w]hen a contract is separable or divisible into a number of elements or transactions, each of which is so far independent of the others that it might stand or fall by itself, and good cause for rescission exists as to one of such portions, it may be rescinded and the remainder of the contract affirmed").

It does not necessarily follow, however, that Faller may rescind the obligation to pay all amounts due Jaffe under the "Employment Agreement". A realistic examination of the overall bargain demonstrates that the so called "performance salary" aggregating $2 million over 5 years, payable out of the first earnings of the corporation, was understood by both sides to be a part of the purchase price.

I conclude that Jaffe has failed to prove his claim for breach of contract and is not entitled to damages for his dismissal. The Faller Group was entitled to disavow the employment contract which Jaffe had obtained by fraud, and was entitled to dismiss Jaffe.

In spite of his dismissal, however, Jaffe remains entitled to receive the payments due him for the purchase of the companies including the so called "performance salary."

The last four annual payments of performance salary were not made him. As of the closing date, these had a present value of $594,440 [1] (using a 9% discount which the evidence established as an appropriate rate as of February 1979 [2]). Jaffe is entitled to a credit of that amount.

## COMPENSATORY DAMAGES FOR FRAUD

The parties disagree as to the appropriate theoretical measure of damages for Jaffe's fraud. Jaffe claims the damages are limited to Faller's out-of-pocket loss, i.e., the difference between purchase price and the value of the companies as Faller received them. The Faller Group claims it is entitled to receive the benefit of its bargain, i.e., the difference between the value of what was contracted for and the value of what was received. The out-of-pocket measure is commonly applied in tort cases and under Rule 10b–5. *See Hackbart v. Holmes,* 675 F.2d 1114, 1121 (10th Cir.1982). The benefit-of-the-bargain measure arises out of contract theory. It is sometimes awarded under the federal securities laws where a false affirmative warranty was made in connection with a sale or merger of a company. *See, e.g., Osofsky v. Zipf,* 645 F.2d 107 (2d Cir.1981); *Singer v. Michigan General Corp.,* 476 F.Supp. 1209 (S.D.N.Y. 1976), *aff'd,* 632 F.2d 1025 (2d Cir.1980); *Voege v. Ackerman,* 364 F.Supp. 72, 73 (S.D.N.Y.1973). Furthermore, New York law awards the benefit-of-the-bargain for fraudulent breach of a contractual warranty. *See, e.g., Clearview Concrete Prod. Corp. v. S. Charles Gherardi, Inc.,* 88 A.D.2d 461, 469, 453 N.Y.S.2d 750, 756 (2d Dep't 1982); *Restatement of Torts,* § 549, Comment g at 116 (1938).

It is not necessary for me to determine which rule is appropriate to this case because on these facts the two formulae produce the same result. The evidence showed that the fair market value of the Jaffe Companies (assuming that the "no investigation" warranty had been true) was accurately reflected in the deal made between Jaffe and Faller. This deal was carefully negotiated among knowledgeable professionals over a substantial period of time. There is every reason to believe, absent convincing indications to the contrary, that their deal fairly assessed the value of the company.[3] Where fair market

---

**1.** The amounts set forth in footnote 4 for the last four years are divided by 2 to give Matt Jaffe's 50% share.

**2.** The evidence indicated that as of February 16, 1979, the risk-free discount rate was approximately 9%. *See, e.g.,* Tr. 1171.

**3.** Faller and Jaffe each offered the testimony of a financial expert on fair market value. Neither however gave convincing evidence on that subject. The testimony of both involved nothing more than valuation of projections based solely on past performance. The past financial history was simply plotted forward on arithme-

value (assuming the truth of the representations) is the same as the purchase price, there is no practical difference between the out-of-pocket and the benefit-of-the-bargain measures.

I find that the agreed purchase price was the $6.5 million cash payment plus the additional $2 million payable over 5 years as "performance salary". Discounted at 9% to the date of sale, these future payments had a present value on the closing date of $1,572,360, making a total purchase price of $8,072,360.[4] I find that this price would have accurately reflected the fair market value of the Jaffe Companies if the warranty had been true.

Since the contract price and the fair market value are the same, it follows that the out-of-pocket and benefit-of-bargain measures are the same. The appropriate measure of Faller's damages is the difference on the date of sale between the price paid and the fair market value of the Jaffe Companies burdened as they were with the fraudulently concealed investigation.

This difference was shown to have three components: first, the diminution in value attributable to the expectation of a diminished future stream of income; second, the diminution in value attributable to expected liabilities for past conduct; and third, the diminution in value attributable to the obligation of the companies' managers to devote their time and energies to the investigation rather than to the development of the business and the expectation of legal fees in connection with the investigation. Although Faller also made contentions of injury to the goodwill of the business, there is no sufficient proof of such injury.

As to the first component, the conclusions of the two financial experts were not far apart. Faller's expert testified that a diminution of the Trans-World fee rates from 9½ to 6% would diminish the present value of the companies' future stream of income by about $3 million. Tr. 629–32. (In my view, the figure was somewhat exaggerated by use of unbalanced discount rates.) Jaffe's expert testified that it would diminish the present value of the future income stream by about $2.1 million. Tr. 1326–27. Based on their testimony and other evidence, I find that if on the date of sale, it had been known that the investigation would cause a reduction of the Trans-World fees to that extent, the market value of the companies would have been reduced by $2.2 million. The reduction in value for this factor is then that percentage of $2.2 million which represents the probability that the investigation would cause such a reduction in the revenues, as it would be assessed by informed bidders for the Jaffe Companies. Such informed bidders would have spoken to the Insurance Department. Although the evidence does not clearly show

---

tic or exponential curves without attention to the particular circumstances of the companies that might affect future performance. Such projections are sometimes described as "naive forecasts". While such naive forecasts are unquestionably a helpful tool in estimating value if used together with other information, past operating figures are not a sufficient basis to establish future expectations or value.

An agreed contract price reached at arms' length by experienced professionals was, in the circumstances of this case, far more reliable evidence of fair market value than such forecasts. In any event, the conclusion reached by Faller's expert was not far from the contract price. It gave some support to the contract price as a reliable indicator of market value.

4. Since the performance salary for the first year was payable weekly, the present value of the first year's obligation was obtained as the average of $400,000 and its present value one year off, or $383,480. Since the payments for the subsequent years were to be made in lump sum at the years end, they have been calculated as the present value on the closing date of payments of $400,000 to be made 2, 3, 4 and 5 years off. Discount rate is at 9%. *See supra* n. 2.

The amounts are as follows:

Present value as at 2/16/79 of Performance Salary obligation.

| | |
|---|---|
| 1st year | $383,480 |
| 2nd year | 336,680 |
| 3rd year | 308,880 |
| 4th year | 283,360 |
| 5th year | 259,960 |
| Total | $1,572,360 |
| Cash Payment 2/16/79 | 6,500,000 |
| Total Purchase Price | $8,072,360 |

what they would have learned at the Insurance Department, it was shown that Department personnel concerned with the investigation considered the arrangement between Trans-World and the Jaffe Companies a "massive rip-off" of their union health fund clients, and were determined to bring about a significant reduction in fees. In addition the rapid subsequent reduction of fees which the Department required is evidence of the probability of such reduction as of February 16. I conclude that informed purchasers would have estimated the probability of such reduction at about 70 to 75% and that the diminution in value for this factor is $1.5 million.[5]

As to the estimation of future liabilities and fines by reason of past conduct, no testimony was explicitly directed to it. Some significant indications came from the fines and reimbursements which were in fact subsequently paid. The Jaffes paid $400,000 by way of settlement of their personal liability. The Faller Group reimbursed Trans-World $197,000. Additionally $50,000 has been paid in connection with the Labor Department investigation which remains open. I have disregarded the $400,000 paid by the Jaffes since it was not ultimately borne by the Faller Group. I find that the fair market value of the Jaffe Companies on February 16, 1979 would have suffered a charge of no less than $200,000 for the other expected liabilities for past overcharging.

Finally I find that $60,000 is the appropriate diminution in fair market value attributable to the obligation of the companies' managers to divert their attention from the development of business to the problems raised by the investigation and to the anticipation that legal fees would be incurred in defending the investigation.

I conclude that on the closing date of February 16, 1979, the Jaffe Companies had a fair market value to one who was fully informed of the investigation of $1,760,000 less than the Faller Group paid for them. Otherwise stated, the fair market value of the Jaffe Companies was $1,760,000 less than it would have been if the warranty of no-investigation had been true.

Jaffe is therefore liable to the Faller Group for $1,760,000, on either the out-of-pocket or the benefit-of-the-bargain measure. Jaffe is entitled to a set-off in the amount of the performance payments still owing to him. The last four annual payments of $200,000 due to Matt Jaffe were not made. These had a present value on the Closing Date of $594,440. *See infra* n. 1. He is entitled to have that amount set off against his liability of $1,760,000. This reduces Jaffe's net liability for compensatory damages for the fraud to $1,166,560.

Because the amount of damages has been calculated as of February 16, 1979, the date the parties entered into the purchase and sale agreement, and because of the nature of defendant's conduct as discussed above, I award prejudgment interest at the rate of 9% per annum from February 16, 1979.

## PUNITIVE DAMAGES

■ Next, the question arises whether Faller has established Jaffe's liability for punitive damages. In my view this must be answered in the affirmative. Although punitive damages are not generally available under Rule 10b–5, *see, e.g., Flaks v. Koegel,* 504 F.2d 702, 706 (2d Cir.1974), they are available for fraud under New York law upon a showing of willful and wanton conduct. *See, e.g., Reinah Devel. Corp. v. Kaaterskill Hotel Corp.,* 86 A.D.2d 50, 54, 448 N.Y.S.2d 686, 688 (1st Dep't 1982); *Russian Church of Our Lady of Kazan v. Dunkel,* 67 Misc.2d 1032, 1061, 326 N.Y.S.2d 727, 757 (Sup.Ct. Nassau Cty.1971), *aff'd in relevant*

---

**5.** Estimating the impact of an investigation on the future of a company of course involves guesswork on a large number of potential variables. Detailed investigation and inquiry can reduce but cannot eliminate the uncertainties. Nonetheless such estimations are commonly made by purchasers (and sellers) of companies.

Although the figures discussed above are necessarily simplified by reason of the sparsity of information, I find this represents a reasonable appraisal of the impact of the investigation on future earnings, seen prospectively on Feb. 16, 1979.

*part,* 41 A.D.2d 746, 341 N.Y.S.2d 148 (2d Dep't 1973), *aff'd,* 33 N.Y.2d 456, 354 N.Y. S.2d 631, 310 N.E.2d 307 (1974). I find that this has been shown and that punitive damages are appropriate.

Jaffe sold the companies to the Faller Group at a price of $8,072,360. By his willful and deliberate fraud he concealed facts which reduced their fair market value to $6,312,360, and imposed a loss on Faller of $1,760,000. To impose liability only in the compensatory amount of Faller's out-of-pocket loss would do no more than deprive Jaffe of his fraudulently gotten gain. It would virtually encourage such fraud in that it would leave the defrauder no worse off than he would have been had he dealt honestly. Meanwhile Faller has suffered heavy costs in the nature of legal expenses in his efforts to recover what he was willfully and wantonly cheated out of.

The fraud here in question was not of a technical or marginal nature. It involved an intentional and willful false warranty with considerable contrivance to attempt to disguise the true facts. I find that punitive damages should be awarded in the amount of $200,000.

### CONVERSION

 I conclude that Faller has not proved its allegation that Matt Jaffe converted company funds by drawing checks in favor of his nephew Barry Chaifetz in the amount of $55,000. Jaffe claimed these were legal fees earned by Chaifetz prior to the sale and reflected on the financial statements as of September 30, 1978, as a part of a $235,000 liability for accrued expenses. Faller claims there is no documentation supporting such legal fees owing to Chaifetz. Chaifetz, however, had written to Faller's accountants on December 19, 1978 (two months before the contract was signed) asserting that he was owed fees of $45,000. (Exh. 251). I find that Faller has failed to sustain the burden of proof.

6. After the close of testimony, the parties submitted additional evidence consisting of exhibits and deposition transcripts. Certain objections were registered to the admissibility of this

### ATTORNEY'S FEES

 Great West seeks to recover its attorneys' fees on the ground that Jaffe's claims against it were frivolous. It is true that Jaffe's claims were not substantiated. Nonetheless they are not so frivolous as to warrant the imposition of attorneys' fees. I note further that Jaffe was brought into court as a defendant and thereafter asserted his claims against Faller and Great West. Great West's claim for attorneys' fees is denied.

\* \* \*

Counsel on both sides are complimented on a most effective presentation of their cases.[6]

Submit judgment on notice.

SO ORDERED.

and other evidence. None of the evidence objected to would in any way affect any aspect of my findings. Accordingly, I have not found it necessary to rule on these objections.