OPINION OF THE COURT
Carol R. Edmead, J.
This is an action for fraud and negligent misrepresentation brought by J & J Trading against Republic National Bank. Defendant Republic has moved to dismiss, pursuant to CPLR 3211 (a) (1) and (7), or in the alternative, for summary judgment, pursuant to CPLR 3212. Plaintiff has cross-moved for disclosure of certain bank records, or alternatively to preclude, and to amend the caption to reflect that Republic is now known as HSBC.
The following facts emerge from the allegations in the complaint (which the court is required to accept as true for the purposes of this motion) and the papers submitted, including affidavits and transcripts of depositions:
J & J is a wholesaler of precious stones. On or about September 8, 1996, Rafael Davidov, the president of Infinity Diamonds International, contacted Daniel Dilmanian (also known as Danny Oilman), vice-president and a manager of J & J, to place an order for 27 strands of pearls on credit for $13,550. Prior to extending credit to Infinity, Dilmanian required Infinity to complete one of J & J’s credit applications. On the application, Infinity listed Warren Perkins, an assistant manager at Republic, as its bank reference. Infinity also listed two trade references, other precious stone dealers from *54 whom Infinity has made purchases. Dilmanian also made a credit inquiry about Infinity with the Jewelers Board of Trade (JBT) and called Republic’s automated teller service to obtain information about Infinity’s account.
The JBT report noted that there were “irreconcilable differences in net worth as well as discrepancies of over $250,000 in the initial capitalization of the operation which cannot be explained. A credit rating has not been assigned.” Dilmanian also spoke to one of the trade references, Gil Diamonds, and inquired about Infinity’s payment history. While not recalling the exact conversation, Dilmanian remembered the responses as “not negative.” Otherwise, he testified, he would have been alarmed and probably not have extended credit.[1] When Dilmanian called the automated teller service two or three times, it indicated that Infinity’s proposed check “is not good at present.”
Subsequently, on or about September 26, 1996, Dilmanian contacted Perkins, an assistant manager at Republic and the account officer of Infinity’s account, to inquire about Infinity’s account. According to Dilmanian, Perkins responded that: Infinity maintained an average balance at Republic “in the low six figures”; approximately $1 million flowed through Infinity’s account each month; Infinity was a nonborrowing customer; Infinity had no bounced checks; Infinity was a good customer; Infinity’s checks “are as good as cash”; Republic would cash Infinity’s checks even if there are insufficient funds in the account; and Republic has a “special arrangement with Infinity.”
Dilmanian also spoke to Cruz Torres, a credit clerk at Merchant’s Bank of New York, where J & J banked, and asked her to contact Republic to inquire about Infinity’s credit worthiness. On or about October 1, 1996, Ms. Torres contacted Republic. She was referred to Warren Perkins. According to her affidavit, Perkins informed Ms. Torres that Infinity maintained an average balance in the low six figures, had no returned items, was a nonborrowing customer, and maintained its account “in a satisfactory manner.”
Plaintiff contends that, as a result of Perkins’ representations, J & J sold the pearls to Infinity on credit, accepting two postdated checks, dated December 3, 1996 and January 3, 1997, totaling $13,550.
On or about October 22, 1996, Infinity once again contacted J & J to place an order for an additional $30,000 worth of *55 pearls. On that day, Dilmanian again contacted Perkins at Republic to “obtain a current financial profile” on Infinity. Once again, Perkins assured Dilmanian that Infinity “had good credit” and that Republic would honor checks from Infinity in the amount of $30,000. Relying upon Perkins’ representation, on or about October 24, 1996, J&J again sold pearls on credit to Infinity, accepting two postdated checks, dated December 12, 1996 and January 15, 1997, totaling $30,000.
On or about November 4, 1996, Infinity advised J&J that its account at Republic had been closed and exchanged the checks for four equivalent checks drawn on an account at Fleet Bank. On November 4th, Dilmanian contacted Perkins again to inquire why the account had been closed. Perkins allegedly said that the bank closed the account because of “a minor problem,” “just because of bank formalities.” Perkins conceded at his deposition that, some time prior to Republic’s closing of Infinity’s account, the control department of the bank had notified him that the account was being investigated because of deposits of traveler’s checks in unusually large amounts. At no time did Perkins advise Dilmanian that there was or had been an investigation of Infinity’s account.
On or about December 3, 1996, J&J presented the first of the four checks. It was dishonored. On or about December 10, 1996, J&J learned that Infinity had commenced bankruptcy proceedings. At the first meeting of creditors, Dilmanian learned from the testimony of Nathan Itzchaki, a principal of Infinity, that Republic had closed the account on October 10, 1996 (four days before Dilmanian’s second conversation with Perkins) and had been investigating Infinity for money laundering.
J&J was never able to collect any of the $43,550 owed by Infinity. J&J contends that it was because Perkins gave such a strong endorsement of Infinity’s credit worthiness that it accepted the postdated checks from Infinity. Because Perkins knew the representations were false, J&J contends, his statements constituted fraud and negligent misrepresentation.
Initially, the plaintiff argues that the motion to dismiss must be summarily denied because under CPLR 3211 (e) such an application must be made before service of the answer. This argument is without merit. CPLR 3211 (e) provides that “[a] motion based upon a ground specified in paragraphs two, seven or ten of subdivision (a) may be made at any subsequent time” (see, Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3211:53, at 73). However, because the parties *56 “deliberately are charting a summary judgment course by laying bare their proof’ (O’Dette v Guzzardi, 204 AD2d 291, 292 [2d Dept 1994]; accord, Four Seasons Hotels v Vinnik, 127 AD2d 310, 320 [1st Dept 1987]), the defendant’s motion is being treated as a motion for summary judgment.
Negligent Misrepresentation
The defendant argues that the complaint must be dismissed because no relationship existed between the plaintiff and Republic; thus, Republic owed no duty to the plaintiff. There is a line of cases which holds that “ [t] o recover on a theory of negligent misrepresentation, a plaintiff must establish that the defendant had a duty to use reasonable care to impart correct information because of some special relationship between the parties, that the information was incorrect or false, and that the plaintiff reasonably relied upon the information provided.” (Grammer v Turits, 271 AD2d 644, 645 [2d Dept 2000]; accord, Hudson Riv. Club v Consolidated Edison Co., 275 AD2d 218, 220 [1st Dept 2000] [“A claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given”].)
There is a “long-standing rule that recovery may be had for pecuniary loss arising from negligent representations where there is actual privity of contract between the parties or a relationship so close as to approach that of privity.” (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 424 [1989]; accord, Plantation House & Garden Prods. v R-Three Investors, 248 AD2d 606 [2d Dept 1998].) However, there have been exceptions to this rule.
Many of the cases alleging negligent misrepresentation involved accountants. (See, e.g., Credit Alliance Corp. v Andersen & Co., 65 NY2d 536 [1985]; Ultramares Corp. v Touche, 255 NY 170 [1931].) The reason for restricting recovery to only those who were in privity or a relationship near privity with the accountants, rather than allowing recovery to all whom the accountants could reasonably have foreseen would rely upon their reports, was “a concern for the indeterminate nature of the risk.” (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d, supra, at 424.) The Court of Appeals has stated that “imposition of such broad liability is unwise as a matter of policy.” (Id., at 425.)
*57 However, such reasoning does not apply where the defendant personally makes a representation to an individual and is aware of that individual’s reliance on that representation. Other decisions have, instead, expressed the rule as requiring reliance by the plaintiff to be “ ‘the end and aim of the transaction’, rather than an ‘indirect or collateral’ consequence of it.” (Kidd v Havens, 171 AD2d 336, 339 [4th Dept 1991], quoting Glanzer v Shepard, 233 NY 236, 238-239 [1922].) J & J’s allegations meet this requirement.
In Houlihan/Lawrence, Inc. v Duval (228 AD2d 560 [2d Dept 1996]), the plaintiff, a real estate broker, represented to the defendant that the residence he was purchasing was designed by a renowned architect. The defendant purchaser refused to pay the commission because, upon resale, he allegedly realized a reduced sale price because of the real estate broker’s inability to prove the representations about the design of the house. The Supreme Court had dismissed the counterclaim for negligent misrepresentation because the parties were not in privity and did not have any kind of special relationship necessary for the imposition of liability. (Id., at 561.)
The Appellate Division found that the court had erred in finding, as a matter of law, that the relationship between the parties was insufficient. The Court reasoned, “the evidence submitted in opposition to the motion demonstrated that the plaintiff allegedly misrepresented the authenticity of the design of the house to a known party with whom it had personal, direct dealings and whose reliance thereupon could be reasonably anticipated.”[2] (Id., at 562.) The Second Department described the standard in cases of negligent misrepresentation: “[T]here may be liability for negligent misrepresentation where there is a relationship between the parties such that there is an awareness that the information provided is to be relied upon for a particular purpose by a known party in furtherance of that purpose, and some conduct by the declarant linking it to the relying party and evincing the declarant’s understanding of their reliance * * * To state it somewhat more succinctly, the relying party ‘must have been a person for whose use the representation was intended’ or Tie must at least have been a member of some very small group of persons for whose guidance the representation was made’.” (Id., at 561 [citations omitted].)
*58 Similarly, in Osuchowski v Gallinger Real Estate (273 AD2d 892 [4th Dept 2000]), the plaintiff, who purchased real estate at an auction conducted by the defendant, alleged that its agent had made negligent misrepresentations during the auction. The Supreme Court’s denial of the defendant’s motion for summary judgment was affirmed. The Appellate Division reasoned: “We reject defendant’s contention that, as a matter of law, a claim for negligent misrepresentation does not lie because the parties were not in privity and did not have a special relationship; ‘there may be liability for negligent misrepresentation where there is a relationship between the parties such that there is an awareness that the information provided is to be relied upon for a particular purpose by a known party in furtherance of that purpose, and some conduct by the declarant linking it to the relying party and evincing the declarant’s understanding of [the] reliance.’” (Id., at 893, quoting Houlihan/Lawrence, Inc. v Duval, 228 AD2d, supra, at 561.) In the instant matter, Warren Perkins, the assistant manager at Republic, spoke personally with Danny Dilmanian, knew the purpose of the credit inquiry was for J & J to determine whether it should advance credit to Infinity, and was aware that J & J would rely on his representation.
Atlantic Bank v Carnegie Hall Corp. (25 AD2d 301 [1st Dept 1966]) involved a promissory note endorsed by the defendants as accommodation endorsers for an orchestra. At the time the defendants endorsed the note, they were unaware that the orchestra’s account at plaintiff bank was overdrawn and that the note would be used to pay the overdraft, rather than to promote a series of concerts (the proceeds of which would have paid the promissory note). In ordering a new trial, the First Department held that whether the plaintiff’s conduct “was calculated to and did induce defendants to believe the proceeds of the loan would be available for the promotion of the 1963-1964 series of concerts * * * presented issues of fact.” The court reasoned that, “[h]aving assumed to respond to [defendant] Warburg’s inquiry, it was plaintiff’s duty ‘to speak fully and truthfully.’ ” (Id., at 306.)
Similarly, in a case on all fours with the instant matter, Anchor Lbr. Corp. v Manufacturers’ Trust Co. (242 App Div 656 [2d Dept 1934]), the Appellate Division affirmed a judgment for the plaintiff where an “inquiry was made of the bank as to an account of a customer of the bank.” The Court held that “there was a duty, in view of the bank’s relations to the public, to speak carefully when the defendant’s employee *59 undertook to speak at all. The inquiry of the bank clearly imported a merchant’s purpose to rely upon the information, and rely upon it it did to its loss.”[3] (Id., at 656.) The rule was not too harsh, the Court reasoned, because “a bank, upon such an inquiry being made, need not answer the inquiry at all or may state to the inquirer, ‘[P] resent your check and we will certify it if good.’ ” (Id., at 656.)
When Dilmanian called Perkins the second time, Dilmanian testified at his deposition, he asked Perkins, “They are asking me for $30,000 in credit. Are they still in good standing?” Dilmanian explained: “I just wanted him to make me feel comfortable. Since there was a discrepancy [between the information provided by the automated teller and that given previously by Perkins], I wanted him to make me comfortable, and he sure did. He gave me a lot of information about their [Infinity’s principals’] personal business, about their social life, about — he told me I can go down there and meet him any time. He gave me a lot of information that he wasn’t asked for just to make me feel comfortable.”
Assuming that these allegations are true, Perkins actively sought to reassure the plaintiff that Infinity was reliable and that it was safe to sell the pearls on credit. If Perkins knew the status of the account at the time of the second inquiry on October 22, 1996 — that the control department had been investigating Infinity and the account had already been closed for four days — then his assurances would constitute negligent misrepresentation.[4] Perkins may not have been at liberty to disclose the investigation, but he certainly did not have to be reassuring. Once he chose to speak, he had to be truthful.
The defendant bank also argues that the complaint must he dismissed because the plaintiff’s reliance on any misrepresentations was unreasonable because “[p]laintiff was on notice through several other sources that there were discrepancies in their customer’s, Infinity’s, credit history.” It is true that J&J *60 was alerted to a possible problem with Infinity’s credit worthiness by the JBT report and the message of the automated teller service. However, Dilmanian received a favorable report from Gil Diamonds, another seller, and also requested assistance from J & J’s bank, which reassured him (based on Perkins’ representations) that Infinity was reliable. Thus, Dilmanian did seem to make an investigation, contrary to the defendant’s argument that he failed to do so. Whether J & J was reasonable in relying upon Perkins’ alleged misrepresentations is a question of fact to be determined at trial.
Accordingly, the defendant’s motion for summary judgment is denied as to the cause of action for negligent misrepresentation.
Fraud
To recover for fraud, a plaintiff must prove: “ ‘(1) a misrepresentation of fact, (2) which was false and known to be false by the defendant, (3) that the representation was made for the purpose of inducing the other party to rely upon it, (4) the other party justifiably did so rely, (5) causing injury’.” (Ruse v Inta-Boro Two-Way Radio Taxi Assocs., 166 AD2d 641 [2d Dept 1990], quoting Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461, 467 [2d Dept 1982]; accord, Hausler v Spectra Realty, 188 AD2d 722, 723 [3d Dept 1992].)
If, as discussed above, Perkins knew that there was an ongoing investigation into Infinity’s account or that the account had already been closed, yet emphatically stated that all was well and that Infinity was a reliable customer, then Republic may be liable for fraud.
Accordingly, the defendant’s motion for summary judgment is denied as to the cause of action for fraud.
Production of Documents
The plaintiff has provided documentation of repeated attempts to attain all of the records kept by Republic concerning Infinity’s account. Perkins testified that there existed documents explaining notations of credit advice or credit overrides and that the control department maintained records regarding their investigation. Such documents may be helpful to the plaintiff in proving its case, but have not been turned over to the plaintiff, despite repeated requests. Further, turning over all records of Infinity’s account maintained by Republic should not be burdensome since the account was only open from June 6, 1995 to October 18, 1996.
*61 Accordingly, the defendant is directed to produce all records kept by Republic pertaining to any aspect of Infinity’s account within 21 days of service of a copy of the order with notice of entry. In the event the defendant fails to fully comply with this order, the plaintiff may, if so advised, make an application, pursuant to CPLR 3126, supported by an appropriate affirmation, striking the defendant’s pleadings or resolving the issues against the defendant.
The plaintiffs application to amend the caption to reflect that the defendant is now known as HSBC is unopposed. Accordingly, it is granted.
Conclusion
The plaintiffs motion for summary judgment is denied. The plaintiffs cross motions to compel production of documents and to amend the caption are granted.

. Dilmanian was unsuccessful in contacting the other trade reference.

. The Supreme Court’s order was, nonetheless, affirmed because the defendant failed to demonstrate that the representations were false. (Id.)

. The Anchor decision (supra) distinguishes its facts from Taylor v Commercial Bank (174 NY 181 [1903]), which held that a bank was not liable for representations made by its cashier (the executive agent of the board of directors) as to the solvency of a customer because the cashier was acting outside the scope of his employment.
It should be noted that, in the instant matter, Perkins testified at his deposition that his duties included responding to credit inquiries about the accounts of bank customers.

. As to Perkins’ knowledge at the time of the first inquiry and the truthfulness of his responses, further discovery may clarify this issue. See discussion below.