OPINION AND ORDER
 

 LEISURE, District Judge.
 

 These actions arise out of the acquisition by Hannover Ruckversicherungs-Ak-tiengesellschaft (“Hannover Re”), a German reinsurance company, of Lion Holding, Inc. (“Lion”). Plaintiffs were officers, directors, and shareholders of Lion at the time of the acquisition in 1999, and remained as executives of Lion after the acquisition through the end of 2001. Defendants are Hannover Re and Lion. Plaintiffs bring these actions for breach of contract, alleging that defendants failed to pay “Earnouts” due under a Stock Purchase Agreement and Employment Agreements executed when Hannover Re acquired Lion. Plaintiffs contend that defendants owe them the maximum Earnouts as provided in the agreements between the parties, which total $100 million. Defendants counterclaim that any damages caused by defendants’ alleged breach of contract
 
 *DXXVIII
 
 must be set off against monies allegedly owed to them by plaintiffs pursuant to an indemnification provision in the Stock Purchase Agreement. Defendants also counterclaim that plaintiffs breached their fiduciary duty to Lion and Hannover Re.
 

 Plaintiffs now bring a motion for partial summary judgment. Plaintiffs contend that there is no genuine issue of material fact in dispute as to one of four Earnouts at issue, that for the year 1999, and ask the Court to grant summary judgment that defendants owe plaintiffs $25 million. Defendants respond that genuine issues of material fact remain in dispute about whether plaintiffs should receive the 1999 Earnout. Defendants also contend that genuine issues of material fact relating to their counterclaims remain in dispute, and that this should prevent summary judgment. For the reasons set forth below, plaintiffs’ motion for partial summary judgment is denied.
 

 Background
 

 I.
 
 The Parties
 

 The current summary judgment motion concerns two actions. In the first action (docket number 02-4258), plaintiffs Robert Ferguson and Ralph Milo assert a breach of contract claim against defendant Lion Holding, Inc. (“Lion”). Lion is an insurance company for which Ferguson and Milo served as executives from at least 1996 to the end of 2001. (Plaintiffs’ Local Rule 56.1 Statement of Material Facts, ¶ 2 (“Plaintiffs’ 56.1”); Affidavit of Joseph W. Jacobs, ¶ 11 (“Jacobs Aff.”).) Plaintiffs also served as officers of Lion’s subsidiary, Clarendon.
 
 [1]
 
 (Plaintiffs’ 56.1, ¶
 
 2-4-,
 
 Answer and Counterclaim of Defendant Lion Holding, ¶ 60-61 (“Lion Answer”).) In this first action, the operable agreements between plaintiffs Ferguson and Milo and defendant Lion are those that govern plaintiffs’ employment as executives of Lion. Plaintiffs claim that defendant Lion owes them $50 million pursuant to these agreements.
 

 In the second action (docket number 02-4261), plaintiffs Ferguson and Milo LP
 
 [2]
 
 assert a breach of contract claim against defendant Hannover Re. Hannover Re is a German reinsurance company that acquired Lion early in 1999. (Plaintiffs’ 56.1, ¶ 1.) Plaintiffs Ferguson and Milo LP bring this second action as the sharehold
 
 *DXXIX
 
 ers who sold Lion to Hannover Re. The central agreement between the selling shareholders and Hannover Re in this action is a Stock Purchase Agreement (“Purchase Agreement”) dated February 16, 1999. (Jacobs Aff., Exh. E.) Plaintiffs claim that Hannover Re owes them $50 million pursuant to this agreement.
 

 The substance of plaintiffs’ claims, defendants’ counterclaims, the applicable contract provisions, and the facts underlying the disputes are essentially the same for both actions. Plaintiffs move for partial summary judgment on both actions for identical reasons, and defendants likewise oppose summary judgment without distinguishing between the actions. Unless otherwise indicated, references below to the parties denote the plaintiffs or defendants in both actions collectively. Likewise, references to agreements and obligations between the parties refer to the actions and contracts between the parties collectively, unless the Court indicates otherwise.
 

 II.
 
 The Agreements
 

 Four agreements between the parties, governing extensive, competing obligations for each side, give rise to plaintiffs’ breach of contract claims and plaintiffs’ current motion for summary judgment. First, Hannover Re acquired Lion from the selling shareholders pursuant to a Purchase Agreement dated February 16, 1999. Second, plaintiff Ferguson remained employed as an executive of Lion and Clarendon after Hannover Re acquired Lion, pursuant to an amended employment agreement. (Jacobs Aff., Exh. F.) Third, plaintiff Milo also remained employed as an executive of Lion and Clarendon after Hannover Re acquired Lion, pursuant to an amended employment agreement. (Jacobs Aff., Exh. G.) The terms of Ferguson’s and Milo’s amended employment agreements are the same for the purposes of this motion, and are referred to in this opinion collectively as the “Employment Agreements.” Fourth, the parties reached a letter agreement, dated February 24, 2000 (the “February Letter”), that addresses some of the parties’ obligations that arise out of the Purchase Agreement and the Employment Agreements. (Jacobs Aff., Exh. I.) The first three agreements largely provide the basis for the contractual relationship between the parties, and thus largely provide the basis for plaintiffs’ breach of contract claims. It is upon the fourth agreement, however, that plaintiffs seek partial summary judgment.
 

 A.
 
 The Purchase Agreement
 

 Defendant Hannover Re acquired Lion pursuant to a Purchase Agreement dated February 16, 1999. (Plaintiffs’ 56.1, ¶ 1; Jacobs Aff., Exh. E.) Article 2 of the Purchase Agreement includes a provision titled “Additional Purchase Price.” (Jacobs Aff., Exh. E, ¶ 2.3.) This provision entitles Ferguson and Milo LP, the selling shareholders, to receive additional compensation if Lion’s subsidiary, Clarendon, achieves particular profitability levels for any or all of four periods: 1999, 2000, 2001, and the combined period 1999-2001. (Plaintiffs’ 56.1, ¶ 3-4; Defendants’ Statement of Disputed Material Facts, ¶ 1 (“Defendants’ 56.1”); Declaration of Herbert Haas, ¶ 6-7 (“Haas Dec!.”).) The additional compensation is called an “Earnout.” Under the Purchase Agreement, the maximum Earn-out payable to Ferguson and Milo LP for any one year period is $12,500,000, of which Milo LP would receive 70% and Ferguson 30%. (Plaintiffs’ 56.1, ¶ 8.)
 

 The criteria used to determine whether Ferguson and Milo LP would receive some or all of the maximum Earnout for any time period is Clarendon’s “Combined Ratio.” (Jacobs Aff., Exh. E, ¶ 2.3.) The Combined Ratio measures Clarendon’s
 
 *DXXX
 
 profitability.
 
 [3]
 
 If Clarendon attained a Combined Ratio of 75% or less for any one year period then the maximum Earnout became due to Milo LP and Ferguson. (Plaintiffs’ 56.1, ¶ 5, 9; Defendants’ 56.1, ¶ 1.) Thus, for example, if Clarendon’s Combined Ratio for 1999 was 75% or less, then Hannover Re is obligated under the Purchase Agreement to pay a $12,500,000 Earnout to Ferguson and Milo LP. Hann-over Re was obligated to pay any Earnout due under the Purchase Agreement by May 15, 2002. (Plaintiffs’ 56.1, ¶6, 9.)
 

 Article 7 of the Purchase Agreement, titled “Indemnification,” includes separate provisions governing the selling shareholders’ obligation to indemnify Hannover Re in certain circumstances. (Jacobs Aff., Exh. E, ¶¶ 7.1-7.6; Plaintiffs’ 56.1, ¶17; Defendants’ 56.1, ¶ 6, 7.) For the purposes of this motion it is useful to note the distinction in Article 7 between two particular indemnity obligations incumbent upon Ferguson and Milo LP. First, Article 7 imposes general indemnification obligations upon the selling shareholders. Article 7 further provides that, should the selling shareholders become obligated to make payments pursuant to the general indemnification provisions, that funds for the payments should be taken from a prioritized list of sources. (Jacobs Aff., Exh. E, ¶ 7.4(B).) Article 7 includes in this list of sources “any amount of Additional Incentive Compensation (as defined under the Employment Agreement Amendments) payable at such time or paid to Milo or Ferguson after the Closing Date,” and “any amounts payable at such time or paid to Milo or Ferguson under Section 2.3 of this Agreement [the Earnout provision].” In sum, Article 7 of the Purchase Agreement specifies that in the event the selling shareholders become obligated to indemnify Hannover Re, Earnouts payable or paid to Ferguson, Milo LP, and Milo pursuant to Article 2 or the Employment Agreements are an eligible source of funds to pay the indemnity.
 

 In February 2001, defendant Hannover Re made a claim for indemnification from the selling shareholders pursuant to these general indemnification provisions. (Plaintiffs’ 56.1, ¶ 18; Defendants’ 56.1, ¶6; Jacobs Aff., Exh. J.) Hannover Re claims that the selling shareholders owe hundreds of millions of dollars in payments for indemnification pursuant to Article 7 of the Purchase Agreement. The selling shareholders dispute this claim for indemnificar tion. (Plaintiffs’ 56.1, ¶ 18; Defendants’ 56.1, ¶ 7; Jacobs Aff., Exh. K.) The parties are currently engaged in litigation in the Supreme Court of New York to resolve this dispute. (Defendants’ 56.1, ¶ 7.)
 

 The second indemnity obligation incumbent upon the selling shareholders is described in paragraphs 7.1(C) and 7.4(D) of the Purchase Agreement, which govern Ferguson and Milo LP’s indemnification obligations with respect to the “LMX Business.” (Jacobs Aff., Exh. E, ¶¶ 7.1(C), 7.4(D);
 
 see
 
 Defendants’ Opposition, at 5 n. 4.) The parties have not developed the substance of this obligation on the current record, as its substance is largely irrele
 
 *DXXXI
 
 vant at this stage. It is important to note, however, that the parties came to dispute the extent of the selling shareholders’ indemnity obligations with respect to the LMX Business. The February letter, discussed below, reflects an effort by the parties to address this dispute.
 

 B.
 
 The Employment Agreements
 

 Prior to Hannover Re’s acquisition of Lion, plaintiffs Ferguson and Milo served as executives of Lion pursuant to Employment Agreements. (Plaintiffs’ 56.1, ¶ 2; Jacobs Aff., Exh. F (Ferguson Agreement), Exh. G (Milo Agreement).) When Hannover Re acquired Lion, it agreed with Ferguson and Milo to keep them employed as executives of Lion, and agreed to execute amendments to the Employment Agreements.
 
 (Id.)
 
 The Employment Agreements between plaintiffs and Hann-over Re, as amended, include provisions titled “Payment of the Additional Incentive Compensation.” These provisions require the payment of Earnouts to Ferguson and Milo, largely on the same terms as under the Purchase Agreement. If Clarendon attained a Combined Ratio of 75% or less for any one year period, then, under the Employment Agreements, Hannover Re would owe Milo and Ferguson a $12,500,000 Earnout payment. (Plaintiffs’ 56.1, ¶ 5; Defendants’ 56.1, ¶ 1.) As with the Purchase Agreement, under the Employment Agreements Milo would receive 70% of the Earnout and Ferguson would receive 30%, and any Earnout must be paid by May 15, 2002. The only material difference between the conditions for the Earnout under the Employment Agreements and the Purchase Agreement is that the Employment Agreements also required that Ferguson and Milo still be employed by Lion as of December 30, 2001. (Plaintiffs 56.1, ¶ 7.) The parties do not dispute that Ferguson and Milo remained employed by Lion through the end of 2001. (Plaintiffs 56.1, ¶ 7.)
 

 The compensation provisions in the Employment Agreements were included to keep Ferguson and Milo on as executives of Lion after its acquisition by Hannover Re. (Jacobs Aff., ¶ 6; Haas Decl., ¶ 6.) As Ferguson and Milo were involved in operating Lion’s subsidiary, Clarendon, the Earnout provisions in both the Employment Agreements and Purchase Agreement provided an incentive for plaintiffs to manage Clarendon at a profitable level.
 
 (Id.)
 
 Having acquired Lion, Hannover Re of course would itself profit by plaintiffs’ profitable management of Clarendon. If, for example, Ferguson and Milo managed Clarendon to a Combined Ratio of less than 75% in 1999, then Hannover Re would profit, and in turn would pay Ferguson, Milo, and Milo LP a combined $25 million in Earnouts pursuant to the Purchase Agreement and Employment Agreements.
 

 C.
 
 The February Letter
 

 While the Purchase Agreement and Employment Agreements are the focus of plaintiffs’ breach of contract claims and defendants’ counterclaims, a letter agreement, dated February 24, 2000 (the “February letter”), is the subject of plaintiffs’ current summary judgment motion. (Jacobs Aff., ¶ 17
 
 &
 
 Exh. I.) The February letter was written by plaintiff Ferguson and sent to Herbert Haas, then the Chief Financial Officer of Hannover Re. Haas countersigned the February letter on behalf of Hannover Re. (Haas Decl., ¶ 8.) The February letter describes an agreement between the selling shareholders of Lion, Ferguson and Milo in their personal capacities, and Hannover Re. In general, the February letter memorializes an agreement between the parties on two issues: the temporary, or immediate payment for
 
 *DXXXII
 
 indemnity by the selling shareholders with respect to the LMX business; and the payment of the 1999 Earnout by Hannover Re to Ferguson, Milo, and Milo LP. The parties dispute virtually any and all possible implications of the February letter. As plaintiffs move for partial summary judgment on the February letter, and defendants contend that the letter is unenforceable for lack of consideration and because it was procured by fraud, the Court must assess the February letter’s import to resolve the current motion.
 

 1.
 
 Plaintiffs’ Description of the February Letter
 

 Plaintiffs contend that the February letter is an enforceable contract. It reflects an agreement between the selling shareholders and Hannover Re. After entering the Purchase Agreement, the selling shareholders and Hannover Re came to dispute the selling shareholders’ indemnity obligation with respect to the LMX Business, and particularly the “LMX Settlement.” The parties apparently agreed that the selling shareholders owed some payment for indemnity to Clarendon (Hannover Re’s newly acquired subsidiary) in association with the LMX Settlement, but disagreed as to the proper amount of the payment. According to plaintiffs, pri- or to the entry of the February letter, defendants sought a payment of $17,183 million for the LMX Settlement, whereas the selling shareholders asserted that they owed roughly $4 million less than that. The February letter purports to resolve, at least temporarily, this discrepancy. Under the terms of the February letter, the selling shareholders agreed to pay $17,183 million, but also agreed to continue good faith negotiations with Hannover Re to resolve the dispute over the proper payment, and to arbitrate the dispute if the negotiations failed. As defendants argue that the February letter lacks consideration, plaintiffs stress that the $17,183 million payment essentially includes a $4 million credit or temporary forfeiture, which would be returned to the selling shareholders should negotiations or arbitration eventually vindicate plaintiffs’ position.
 
 {See
 
 Plaintiffs’ Reply Memorandum of Law in Support of Their Motions for Partial Summary Judgment, at 5 (“Plaintiffs’ Reply”).)
 

 The selling shareholders also agreed in the February letter to exclude the $17,183 million from Clarendon’s financial statement for the purpose of calculating Ferguson and Milo’s 1999 bonus. Plaintiffs contend that the Employment Agreements provide that Milo and Ferguson were entitled to a bonus, separate from the Earn-outs, that would be calculated as a percentage of Clarendon’s profits. (Plaintiffs’ Reply, at 6; Jacobs Aff., Exhs. F
 
 &
 
 G.) By agreeing to exclude the $17,183 million payment from Clarendon’s profits, plaintiffs thus diminished the funds from which their bonus would be calculated.
 

 Plaintiffs contend that in exchange for these considerations, defendants agreed to pay the 1999 Earnout. Section 4 of the February letter written by Ferguson, titled “Earn out,” reads as follows:
 

 Section 2.3 of the Stock Purchase Agreement obligates Hannover to pay to Milo L.P. and me Additional Purchase Price as calculated in that provision. Ralph and I are separately entitled to receive Additional Incentive Compensation calculated on the same basis under our Employment Agreement Amendments. Hannover has agreed with Ralph, Milo L.P., and me that (i) Milo L.P. and I have qualified for and are entitled to receive our respective shares of the maximum $12.5 million dollar Additional Purchase Price for 1999 and (ii) Ralph and I have separately qualified for and are entitled to receive (subject
 
 *DXXXIII
 
 only to Section II of Exhibit B of the Existing Employment Agreement, as amended) the maximum $8.75 million and $3.75 million, respectively, of Additional Incentive Compensation for 1999 under our respective Existing Employment Agreement, as amended, in each case payable as provided in such documents.
 

 (Jacobs Aff., Exh. I, § 4.) In other words, Hannover Re agreed in the February letter to pay the 1999 Earnout to plaintiffs. (Haas Decl., ¶ 9.)
 

 2.
 
 Defendants’ Description of the February Letter
 

 Defendants offer a separate account of the February letter and its implications. Defendants contend that sections 7.1(C) and 7.4(D) of the Purchase Agreement required the selling shareholders to indemnify Clarendon for $17,163 million for the LMX Settlement. Thus the February letter simply noted the selling shareholders’ pre-existing obligation. Defendants also assert that plaintiffs’ agreement to exclude the $17,183 million from the calculation of their bonus “would have had little or no effect on Ferguson and Milo’s bonus for 1999.” (Defendants’ Opposition, at 19-20 n. 11.) The February letter, according to defendants, simply describes the existing relationship between the parties. It does not create any new obligations to be performed by plaintiffs.
 

 As to the Earnout provision in the February letter, defendants admit that the February letter reflects their agreement to pay the 1999 Earnout. (Haas Decl., ¶ 9.) The parties appear to agree on this point that defendants agreed to pay the 1999 Earnout because they understood Clarendon to have attained a Combined Ratio of less than 75%. (Haas Decl., ¶ 10; Plaintiffs’ Reply, at 6 (“Defendants’ obligation to pay [plaintiffs] this amount was not triggered by the February 24 Side Letter, but rather by the GAAP financial statement of Clarendon from which ‘it would have been self-evident ... that Clarendon’s Combined ratio was below 75.’ ”).) Defendants contend now, however, that Clarendon in fact did not attain a Combined Ratio of less than 75%, and thus the Earnout section of the February letter is unenforceable.
 

 To support their contention that Clarendon’s Combined Ratio was higher than 75%, defendants submit the affidavit of a former senior vice president of Clarendon America, William Roche. Roche states that plaintiffs Ferguson and Milo served respectively as president and Chief Executive Officer of Clarendon in 1999 when serious problems with Clarendon’s subsidiary, Eton Management Corporation (“Eton”) arose. (Affidavit of William Roche, ¶ 2-4 (“Roche Aff.”).) Eton once had the power to issue insurance policies in Clarendon’s name, but Clarendon terminated this relationship with Eton in March 1999. (Roche Aff., ¶ 3-5.) Eton then appeared to enter an agreement with CNA Reinsurance (Europe) Ltd. (“CNA Re”) in August 1999 that would limit Clarendon’s exposure under Eton’s insurance policies. (Roche Aff., ¶ 6.)
 
 [4]
 
 Roche states that he subsequently learned that CNA Re entered no such agreement, and that in October 1999 Eton’s owner admitted that he had forged CNA Re’s stamp and the initials of its underwriter. (Roche Aff., ¶ 7-11.) Roche states that Ferguson and Milo were aware of the forgery.
 
 (Id.
 
 ¶ 12.) Anders Larrson, Clarendon’s Chief Financial Officer since 2000, states in an affidavit submitted by defendants that Ferguson and Milo did not change Clarendon’s records to reflect accurately the unenforeea-
 
 *DXXXIV
 
 ble agreement. (Affidavit of Anders Larr-son, ¶ 4-9.) Because Ferguson and Milo did not change Clarendon’s records, Clarendon’s Combined Ratio appeared artificially reduced.
 
 (Id.
 
 ¶ 10.) Had Clarendon’s financial statements been accurate, Clarendon’s Combined Ratio would have been greater than 75%.
 
 (Id.
 
 at ¶ 12.)
 

 III.
 
 The Disagreements
 

 The parties have brought to this Court one of apparently several disagreements as to the their mutual obligations under their contractual relationship. Plaintiffs filed two actions in this Court, seeking $100 million in Earnout payments from defendants for their alleged breaches of the several contracts between the parties. Defendants counterclaimed that any damages caused by their alleged breach of contract must be set off against monies allegedly owed to them by plaintiffs pursuant to the general indemnification provisions. Defendants also counterclaimed that plaintiffs breached their fiduciary duty to defendants by manipulating, among other things, reserves, retention levels, and expenses to procure defendants’ assent to the February letter.
 

 Plaintiffs now move for partial summary judgment. Plaintiffs seek summary judgment awarding them the full 1999 Earn-out, which is $25 million. Plaintiffs contend that the February letter contractually obligates defendants to pay the 1999 Earn-out, and there is no genuine issue of material fact in dispute on the issue. Defendants oppose the motion on several grounds.
 

 Discussion
 

 Plaintiffs’ motion for summary judgment presents the straightforward claim that defendants breached their contractual obligations to plaintiffs, namely those obligations arising under the February letter, and that defendants should now be ordered to meet those obligations.
 

 Defendants oppose plaintiffs’ motion on essentially three grounds. First, defendants contend that the February letter is not an enforceable contract because it imposes no new obligations on plaintiffs. The February letter, in other words, lacks consideration according to defendants.
 

 Second, defendants argue that Clarendon did not achieve a Combined Ratio of 75% or less for 1999, because the Eton transaction in fact was not enforceable and thus did not reduce the Combined Ratio. Defendants argue further that Ferguson and Milo concealed this information from defendants to procure the February letter, which assures that the 1999 Earnout will be paid. The circumstances of the Eton transaction, according to defendants, raises at least a factual dispute as to Clarendon’s actual profitability for 1999. Defendants contend that this factual dispute alone prevents summary judgment. Defendants also contend that because plaintiffs concealed the circumstances of the Eton transaction from defendants, the February letter is unenforceable. Defendants style this argument under the law of fraudulent concealment, and ask the Court for leave to amend their pleadings to the extent that they fail to allege a sufficient counterclaim with respect to this issue.
 

 Third, defendants argue that genuine factual issues remain in dispute as to plaintiffs’ indemnity obligations under the Purchase Agreement. Defendants contend that, according to the doctrines of equitable recoupment or setoff, these factual issues preclude summary judgment. The Court addresses defendants’ arguments in turn.
 

 I.
 
 Summary Judgment Standard
 

 A moving party is entitled to summary judgment if “the pleadings, depositions,
 
 *DXXXV
 
 answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c);
 
 see Celotex Corp. v. Catrett, 477
 
 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);
 
 Holt v. KMI-Continental Inc.,
 
 95 F.3d 123, 128 (2d Cir.1996). The substantive law underlying a claim determines if a fact is material and “[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering the motion, the Court’s responsibility is not “to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.”
 
 Knight v. U.S. Fire Ins. Co.,
 
 804 F.2d 9, 11 (2d Cir.1986).
 

 In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party.
 
 See Anderson,
 
 477 U.S. at 255, 106 S.Ct. 2505;
 
 Holt,
 
 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue of material fact exists.
 
 See Adickes v. S.H. Kress & Co.,
 
 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970);
 
 Gallo v. Prudential Residential Serv. L.P.,
 
 22 F.3d 1219, 1223-24 (2d Cir.1994). “The movant’s burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party’s claim.”
 
 Goenaga v. March of Dimes Birth Defects Found.,
 
 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges its burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists.
 
 See Celotex, 477
 
 U.S. at 324, 106 S.Ct. 2548. The nonmoving party “must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). “A ‘genuine’ dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.”
 
 Dister v. Cont’l Group,
 
 859 F.2d 1108, 1114 (2d Cir.1988) (citing
 
 Anderson, 477
 
 U.S. at 248, 106 S.Ct. 2505).
 

 II.
 
 A Genuine Issue of Fact Remains in Dispute About Whether the February Letter Is an Enforceable Contract
 

 The parties disagree about whether the February letter is an enforceable contract.
 

 New York law applies in this case. (Jacobs Aff., Exh. E § 10.9 (Purchase Agreement clause stating that New York law applies); Jacobs Aff., Exhs. F ¶ 10(e) & G ¶ 10(e) (Employment Agreements clauses stating that New York law applies); Plaintiffs’ Memo, at 4, 5 (stating that New York law applies); Defendants’ Opposition, at 7-23 (citing New York law throughout).) The elements of a breach of contract claim under New York law are (1) the existence of a contract, (2) plaintiffs performance, (3) breach by the defendant, and (4) damages.
 
 Terwilliger v. Terwilliger,
 
 206 F.3d 240, 245-46 (2d Cir.2000);
 
 Harsco Corp. v. Segui,
 
 91 F.3d 337, 348 (2d Cir.1996).
 

 On this summary judgment motion, plaintiffs contend that all the elements of their breach of contract claim are satisfied with respect to the 1999 Earnout. Plaintiffs contend that: (1) the February letter is a contract; (2) they performed by paying defendants $17,183 million; (3) defendants breached by not paying the 1999 Earnout; and (4) plaintiffs have suffered $25 million in damages. Defendants contend that, as to the first element, the
 
 *DXXXVI
 
 February letter is not an enforceable contract because it lacks consideration, and because plaintiffs fraudulently concealed material information when the parties agreed to the terms of the February letter.
 

 A.
 
 The February Letter Is not Unenforceable for Lack of Consideration
 

 Defendants argue that the February letter is unenforceable because it lacks consideration. Under New York law, “consideration is a necessary ingredient for an enforceable contract.”
 
 Roth v. Isomed, Inc.,
 
 746 F.Supp. 316, 319 (S.D.N.Y.1990) (citing
 
 Holt v. Feigenbaum,
 
 52 N.Y.2d 291, 437 N.Y.S.2d 654, 419 N.E.2d 332, 336-337 (1981)). Consideration is simply a bargained-for exchange of promises or performance. Rest. (Second) of Contracts, § 71 (1981);
 
 see First Federal Savings Bank v. Nomura Securities,
 
 93 Civ. 2519, 1995 WL 217539, at
 
 *5
 
 (S.D.N.Y. April 12, 1995). Generally, “[pjarties are free to make their own bargains, and, absent a claim of fraud or unconscionability, it is ‘enough that something of real value in the eye of the law was exchanged.’ ”
 
 Personalized Media Communications, L.L.C. v. StarSight Telecast, Inc.,
 
 2000 WL 1457079, at *4 (S.D.N.Y. Sept.28, 2000) (quoting
 
 Apfel v. Prudential-Bache Sec. Inc.,
 
 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095, 1097 (1993)). “A promise to carry out a preexisting contractual obligation,” however, “generally is not sufficient consideration.” C.J.S. Contracts, § 122;
 
 see International Paper Co. v. Suwyn,
 
 951 F.Supp. 445, 448 (S.D.N.Y.1997);
 
 James A. Haggerty Lumber & Mill Work, Inc. v. Thompson Starrett,
 
 22 A.D.2d 509, 256 N.Y.S.2d 1011, 1012-13 (1st Dep’t 1965).
 

 Defendants argue that the February letter is not enforceable because plaintiffs promised nothing in the letter that they were not already obligated to perform under the Purchase Agreement. Specifically, sections 7.1(C) and 7.4(D) of the Purchase Agreement require the selling shareholders to indemnify Hannover Re’s affiliates (such as Clarendon) for claims connected to the LMX Business. These provisions, defendants argue, obligated plaintiffs to pay $17,183 million to indemnify Clarendon, and the February letter merely acknowledges that existing obligation. Defendants also argue that the term under which plaintiffs exclude the $17,183 million payment from the calculation of their bonus “would have had little or no effect on Ferguson and Milo’s bonus for 1999.” (Defendants’ Memo, at 19-20 n. 11.) Thus defendants argue that the February letter is not an enforceable contract because it lacks consideration.
 

 Plaintiffs respond that, prior to the signing of the February letter, the parties disagreed about plaintiffs’ obligations to indemnify Clarendon for the LMX Settlement. The February letter reflects a separate bargain, by which plaintiffs agreed to pay the $17,183 million sought by Hann-over Re, and by which defendants agreed to return any excess payment should ongoing negotiations or arbitration conclude that plaintiffs owed less than $17,183 million. Plaintiffs therefore contend that by making the $17,183 million payment they assumed a credit risk, and they temporarily forfeited the right to possession of that sum. Plaintiffs also note that they agreed in the February letter to exclude the payment from the calculation of their bonus, and argue that this consideration diminished their bonus by almost $2 million. (Plaintiffs’ Reply, at 6.) Thus plaintiffs argue that the February letter does not lack consideration.
 

 The Court agrees with plaintiffs that the parties exchanged consideration in the February letter. In section 3 of the February letter, plaintiffs agree to exclude the
 
 *DXXXVII
 
 $17,183 million payment to Hannover Re’s subsidiary from the calculation of their bonus under Exhibit A of the Employment Agreements. (Jacobs Aff., Exh. I.) This concession is not included, or even referenced, anywhere in the Purchase Agreement or Employment Agreements, and clearly was made after the execution of those agreements. Plaintiffs had no preexisting duty to undertake this obligation, or, more specifically, to concede this benefit.
 

 Moreover, the Court need not resolve the parties’ dispute over the precise value of plaintiffs’ concession. When consideration is forbearance, “it must generally be to refrain from doing that which a party has a legal right to do.”
 
 Roth,
 
 746 F.Supp. at 319. The “adequacy of the consideration,” or the value of the forbearance, “is not a proper subject for the court’s review.”
 
 First Federal,
 
 1995 WL 217539, at *5;
 
 see Apfel,
 
 600 N.Y.S.2d 433, 616 N.E.2d at 1097. It appears to the Court that under the Employment Agreements the $17,183 million indemnity payment would affect the calculation of plaintiffs’ bonus, as would its exclusion. In a footnote, defendants aim to contest this point, but offer only that the payment “would have had little or no effect on Ferguson and Milo’s bonus.” (Defendants’ Opposition, at 19-20 n. 11.) Defendants’ argument, even if correct, addresses only the value of the consideration, but does not address whether consideration is present.
 

 Because the February letter elsewhere incorporates plaintiffs’ consideration, the Court need not resolve whether plaintiffs’ payment of $17,183 million qualifies as consideration. In any event, the parties appear to raise a genuine issue of fact on this point, namely, what is the proper scope of the Purchase Agreement provision regarding plaintiffs’ obligation to indemnify Clarendon for the LMX loss. If the Purchase Agreement in fact obligates plaintiffs to indemnify Clarendon for $17,183 million, then plaintiffs’ concession in the February letter to make this payment perhaps does not qualify as consideration.
 
 [5]
 

 Finally, the Court notes that the February letter, which begins “This letter confirms our agreement,” generally reflects compromises between the parties as to their rights and obligations under the Purchase Agreement. It memorializes the parties’ agreement on how to proceed in light of their disagreement about certain of the Purchase Agreement’s terms. Viewed as a whole, it reflects an exchange between the parties that, while hard to quantify, is nevertheless present.
 

 The Court therefore finds that the February letter reflects a bargained-for exchange, and is not unenforceable for lack of consideration.
 

 
 *DXXXVIII
 
 B.
 
 A Genuine Issue of Material Fact Remains in Dispute as to Whether Plaintiffs Fraudulently Concealed Information Material to the February Letter
 

 Defendants argue that the February letter is unenforceable because plaintiffs fraudulently concealed information material to its terms. Under New York law, a party must prove five elements to establish fraudulent concealment: (1) the opposing party had a duty to disclose material information, yet (2) made a materially false representation, (3) intended to defraud, (4) upon which the party reasonably relied and (5) suffered damages as a result.
 
 Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57
 
 F.3d 146, 153 (2d Cir.1995);
 
 see Brass v. American Film Technologies, Inc.,
 
 987 F.2d 142, 152 (2d Cir.1993);
 
 Nasik Breeding & Research Farm Ltd. v. Merck & Co.,
 
 165 F.Supp.2d 514, 528-29 (S.D.N.Y.2001). Each element of the claim must be proved by clear and convincing evidence.
 
 Banque Arabe, 57
 
 F.3d at 153.
 

 Defendants contend that the elements of fraudulent concealment are met with respect to the February letter. Defendants initially note that plaintiffs owed defendants a fiduciary duty, and thus a duty to disclose. Defendants then contend in their motion papers, and with supporting affidavits, that plaintiffs concealed information about the transaction made by Eton purportedly on behalf of Clarendon. According to defendants, Clarendon’s accounting reflected the Eton transaction, and showed a Combined Ratio of less than 75% at the time the parties agreed to the February letter. Defendants now argue in opposition to summary judgment that the Eton transaction was unenforceable, that Clarendon’s Combined Ratio for 1999 exceeded 75% once the Eton transaction is properly accounted for, and that plaintiffs were aware of this circumstance. The parties seem to agree that defendants agreed to pay the 1999 Earnout on the understanding that the Combined Ratio was accurate and below 75% for that year. (Haas Deck, ¶ 10; Plaintiffs’ Reply, at 6.) Defendants thus contend that plaintiffs fraudulently concealed material information from them prior to the signing of the February letter, and that the Court must therefore deny plaintiffs’ summary judgment motion.
 

 Plaintiffs respond that they did not mislead defendants at the time of the February letter. According to plaintiffs, defendants were aware of the problems with the Eton transaction and they agreed to pay the 1999 Earnout anyway. Plaintiffs also respond that defendants have not sought to rescind the February letter and have not pleaded a defense of fraud. Defendants have accepted the benefit of the February letter, but have disavowed their own obligations under the February letter. Plaintiffs argue therefore that even if defendants have established the elements of fraudulent concealment, this should not prevent the Court from granting plaintiffs’ summary judgment motion.
 

 1.
 
 The Alleged Fraud Must Relate to the February Letter for the Purposes of Plaintiffs’ Motion for Summary Judgment
 

 As an initial matter, the Court must address defendants’ suggestion that the circumstances of the Eton transaction preclude summary judgment in two ways. Defendants argue first that summary judgment must be denied because Clarendon did not achieve a Combined Ratio of 75% or less, as required by the Purchase Agreement and Employment Agreements. Defendants second argue that summary judgment must be denied because plaintiffs fraudulently concealed information material to the terms of the February
 
 *DXXXIX
 
 letter. The factual predicate for each of defendants’ arguments is the Eton transaction and plaintiffs’ alleged failure to notify defendants that it was unenforceable.
 

 The first of defendants’ arguments is not relevant to the motion before the Court. Plaintiffs have asked the Court to grant partial summary judgment on the claim that defendants breached the February letter by not paying plaintiffs the 1999 Earnout. While Clarendon’s profitability was a material fact at the time the parties agreed to the February letter, the February letter includes no terms or requirements with respect to Clarendon’s profitability. Defendants’ first argument does not address the substantive law underlying the plaintiffs’ claim. Presented as such, defendants’ first argument cannot preclude summary judgment.
 
 See Anderson, 477
 
 U.S. at 248, 106 S.Ct. 2505 (“Factual disputes that are irrelevant or unnecessary will not be counted [in the summary judgment decision].”).
 

 Defendants’ second argument, that the February letter is unenforceable because plaintiffs fraudulently concealed material information, suffers similar infirmities to the first argument, which are discussed below. It does, however, properly preclude summary judgment.
 

 2.
 
 A Genuine Issue of Fact Remains in Dispute About the Parties’ Understanding When They Signed the February Letter
 

 Clarendon’s profitability for 1999, and each party’s awareness of the circumstances of the Eton transaction and its impact on Clarendon’s profitability, are in dispute. In submissions to the Court on behalf of defendants, Herbert Haas and Anders Larrson state, in substance, that Milo and Ferguson had a duty to disclose material information to defendants. They further state that Milo and Ferguson were aware that the Eton transaction was unenforceable, and that Clarendon’s Combined Ratio was artificially reduced because Clarendon recorded the Eton transaction as enforceable. Defendants claim that concealing the circumstances of the Eton transaction demonstrates the intent of plaintiffs Milo and Ferguson to defraud defendants so as to receive the 1999 Earn-out when it was not due. Haas and Larr-son further state that had plaintiffs informed them of the circumstances of the Eton transaction, Hannover Re would not have agreed to the terms of the February letter.
 

 Plaintiffs respond that Milo and Ferguson communicated whatever knowledge they had of the Eton transaction to defendants. Plaintiffs point to the declaration of Anders Larrson, which attaches minutes of a December 2, 1999, Clarendon meeting. These minutes show, plaintiffs contend, that defendants were aware of the problems with the Eton transaction before agreeing to the February letter. Plaintiffs also submit a reply affidavit of Ferguson, which attaches an internal memorandum dated November 1999, to show that the actions taken with respect to Eaton Management
 
 [6]
 
 were reported to defendants. Plaintiffs also contend that none of defendants’ declarants actually state that the Eton transaction was unenforceable, and argue that it in fact was enforceable.
 

 It is clear to the Court that, at the very least, defendants have raised a factual dispute about the circumstances of Clarendon’s profitability at the time Hannover Re
 
 *DXL
 
 agreed to the terms of the February letter. The parties both understood when they signed the February letter that Clarendon had a Combined Ratio of less than 75% for the year 1999. Senior executives of Clarendon and HDI, Hannover Re’s parent company, have now stated, under penalty of perjury, that Clarendon’s Combined Ratio in fact was greater than 75%, and that plaintiffs hid this fact from defendants. Plaintiffs certainly make compelling arguments about defendants’ awareness of the Eton transaction, and about whether the Eton transaction was enforceable. The dispute, however, is a factual one, which the Court will not resolve on a motion for summary judgment.
 
 See Knight v. U.S. Fire Ins. Co.,
 
 804 F.2d 9, 11 (2d Cir.1986) (holding that, on summary judgment, a court’s responsibility is not “to resolve disputed issues of fact but to assess whether there are any factual issues to be tried”).
 

 3.
 
 The Materiality of Defendants’Allegations of Fraud Is not Ascertainable on the Current Record
 

 Ultimately the pivotal problem confronting the Court on plaintiffs’ summary judgment motion is what to do about defendants’ allegations of fraud, which raise a factual dispute. Defendants’ allegations of fraud, and the factual disputes underlying those allegations, do not preclude summary judgment by themselves. Rather, the factual disputes must be material to the legal claims before the Court to preclude summary judgment.
 
 See Western World Insurance Co. v. Stack Oil, Inc.,
 
 922 F.2d 118, 121 (2d Cir.1990) (“The existence of disputed facts that are immaterial to the issues at hand is no impediment to summary judgment.”). On the current record, any factual issues related to Clarendon’s profitability and the Eton transaction appear immaterial. Thus, plaintiffs argue, defendants’ allegations of fraudulent concealment cannot preclude summary judgment in plaintiffs’ favor.
 

 When a party to a contract suspects that it has been defrauded, the party may not simply accept the benefit of the bargain and ignore its own obligations. Although the contract law jargon varies from one authority to another, the general principle is clear. A contract procured by fraud is not void, but voidable.
 
 See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.,
 
 263 F.3d 26, 32-33 (2d Cir.2001) (discussing void versus voidable contracts); Restatement (Second) of Contracts, § 164. “Faced with a voidable contract induced by fraud, the defrauded party has the option to either disaffirm or affirm the contract.”
 
 Ladenburg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.,
 
 176 F.Supp.2d 199, 204 (S.D.N.Y.2001);
 
 see Turkish v. Kasenetz,
 
 27 F.3d 23, 28 (2d Cir.1994) (Lumbard, J.) (“A party who has been fraudulently induced to settle a claim may either (1) rescind the settlement or (2) ratify the settlement, retain the proceeds, and institute an action to recover fraud damages.” (citing
 
 Slotkin v. Citizens Cas.,
 
 614 F.2d 301, 312 (2d Cir.1979)));
 
 Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.,
 
 88 A.D.2d 461, 453 N.Y.S.2d 750, 754 (2d Dep’t 1982) (“Upon discovering fraud, a purchaser may tender return of the property and seek rescission or he may retain the property and seek recovery of damages deriving from the fraud.”).
 

 A party that chooses to affirm the contract may bring a tort action for fraud against the party that defrauded it.
 
 See Keywell Corp. v. Weinstein,
 
 33 F.3d 159, 165 (2d Cir.1994);
 
 Turkish,
 
 27 F.3d at 28;
 
 Slotkin,
 
 614 F.2d at 312;
 
 Clearview Concrete,
 
 453 N.Y.S.2d at 754; Restatement (Second) of Torts, § 550. By electing to affirm and sue for fraud, a defrauded party does not necessarily incur an obligation
 
 *DXLI
 
 to return any consideration it received under the contract.
 
 See Turkish,
 
 27 F.3d at 28;
 
 Slotkin,
 
 614 F.2d at 312; 27 Samuel Williston & Richard A. Lord,
 
 A Treatise on the Law of Contracts
 
 §§ 69:47
 
 &
 
 69:53 (4th ed. 2003)
 
 (‘Williston on Contracts”)
 
 (“In order to maintain such an action where benefit has been received by the plaintiff, it is not necessary that such benefit be returned. The defrauded party may retain this benefit and sue for the damages he has suffered.”). Fraudulent concealment is such an action for fraud. Fraudulent concealment, like any fraud action, must be pleaded with particularity pursuant to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure,
 
 Nasik,
 
 165 F.Supp.2d at 529;
 
 Affiliated FM Insurance Co. v. Jou Jou Designs, Inc.,
 
 No. 90 Civ. 8262, 1997 WL 473382, at *2-3 (S.D.N.Y. Aug. 19, 1997) (“Fraud allegations should specify the time, place, speaker, and content of the alleged misrepresentations or omissions.”), and must be proved by clear and convincing evidence.
 
 Banque Arabe,
 
 57 F.3d at 153.
 

 A party that chooses to disaffirm the contract may assert rescission of the contract as an affirmative defense.
 
 See Ladenburg,
 
 176 F.Supp.2d at 204;
 
 Clearview Concrete,
 
 453 N.Y.S.2d at 754;
 
 Williston on Contracts,
 
 § 69:47;
 
 see, e.g., Energy Capital Co. v. Caribbean Trading and Fidelity Corp.,
 
 No. 93 Civ. 8100, 1996 WL 157498, at *8 (S.D.N.Y. April 4, 1996) (Keenan, J.) (dismissing defendants’ affirmative defense of rescission based on fraudulent concealment because defendants failed to show a duty to disclose). Generally a party seeking rescission of a contract must tender the return of consideration it received pursuant to the voidable contract,
 
 see Ladenburg,
 
 176 F.Supp.2d at 204 (“To disaffirm the contract, the defrauded party must offer to return any consideration received.”), although exceptions to this rule are present under New York law.
 
 See Prudential,
 
 630 F.Supp. at 1300-03 (citing, among other things, CPLR § 3004 and
 
 ETC Corp. v. Title Guarantee and Trust Co.,
 
 271 N.Y. 124, 2 N.E.2d 284 (1936), for the principle that retaining money paid under a contract does not necessarily ratify the contract when the money is received during the pendency of a rescission action, but cautioning that when the money is received “[i]n the absence of a formal pleading requesting rescission, all the circumstances attending a party’s course of conduct are relevant to determining whether an intent to ratify has been established”).
 

 Perhaps even additional actions or remedies remain available to a defrauded party. The distinctive point for the purposes of the current motion, however, is that in any event the defrauded party must make a choice, because the alternative rights to affirm or disaffirm lead to inconsistent remedies.
 
 See Williston on Contracts
 
 §§ 69:47, 69:56 (4th ed. 2003) (“[The defrauded party] may in effect affirm the contract and sue the party who defrauded him for his damages, or he may repudiate the contract and recover the purchase price paid. As these rights are inconsistent, he cannot do both.”);
 
 see also Clearview Concrete,
 
 453 N.Y.S.2d at 754 (“[The defrauded party] may not, however, affirm the transaction, keep the property and at the same time recover the costs of acquiring and maintaining it.”). Failure by a defrauded party to choose a right and remedy may have adverse consequences. One such consequence of inaction could be tacit affirmance, particularly in a situation where the defrauded party has an opportunity to avoid a voidable contract.
 
 See
 
 Restatement (Second) of Contracts, §§ 380, 383;
 
 see, e.g., Clearview Concrete,
 
 453 N.Y.S.2d at 754 (“[Claimant] abandoned its rescission rights when — cognizant of the
 
 *DXLII
 
 fraud — it accepted the benefits of the contract and thereby affirmed it.”).
 

 Here, defendants have essentially accepted the benefit of the February letter and ignored their obligations under the same letter. In their answer to each complaint, defendants plead a confusing counterclaim, a sort of crossbreed of breach of fiduciary duty and fraudulent concealment. (Jacobs Aff., Exh C ¶¶ 60-69, Exh. D ¶¶ 50-56.) Defendants later submitted a letter to this Court explicitly stating that this counterclaim is for breach of fiduciary duty “and
 
 not,
 
 as plaintiffs suggest, for ‘fraud.’ ” (Jacobs Aff., Exh. M.) Defendants now argue in opposing plaintiffs’ motion that plaintiffs fraudulently concealed information material to the terms of the February letter and that the fraudulent concealment precludes summary judgment. Defendants also request leave to amend their answers if the Court finds they have failed to allege fraud with particularity. But for their imperceptible counterclaim, defendants appear never to have made any effort to affirm or disaffirm the February letter, even after they became aware of plaintiffs’ alleged fraudulent concealment.
 

 Plaintiffs astutely seize on defendants’ apparent failure to affirm or disaffirm the February letter after becoming aware of plaintiffs’ alleged fraudulent concealment. Plaintiffs contend that “Either Defendants waived their rights to raise such an argument in the February 24 Side Letter, or they are alleging that the agreement should be rescinded, in which case the consideration Plaintiffs paid under that agreement should be refunded.” (Plaintiffs’ Reply, at 2.) Indeed, under New York law, a party may “ratify” a voidable contract by accepting benefits flowing from it, and thereby waive the right to rescind the contract.
 
 See Prudential,
 
 630 F.Supp. at 1300.
 

 Defendants’ conduct with respect to the February letter leaves them in a conundrum. They allege that plaintiffs procured the February letter by concealing material information. Defendants, however, accepted plaintiffs’ payment for indemnity under the February letter, and did not pay the 1999 Earnout promised in the letter. Thus, should defendants counterclaim fraud, they face an uphill battle to prove damages, an essential element of fraud. On the other hand, should defendants counterclaim for rescission, they risk being required to return any consideration they received pursuant to the February letter. And should defendants assert no counterclaim, then nothing precludes the Court from granting summary judgment in plaintiffs’ favor.
 
 Cf. Keywell,
 
 33 F.3d at 165 (“Keywell’s election to affirm the contract rather than seek rescission impacts Key-well’s rights to avoid contractual limitations on damages for breach of representations and warranties.”).
 

 For defendants’ part, the answers in this action plead that “The February 24, 2000 Letter Agreement is therefore null and void as it was procured by plaintiffs’ manipulative conduct, by plaintiffs’ self-dealing and by plaintiffs’ deliberate concealment of facts.” (Jacobs Aff., Exh. C ¶ 67;
 
 see
 
 Jacobs Aff., Exh. D ¶ 54.) Moreover, defendants contend intermittently in their opposition papers that plaintiffs’ motion for summary judgment is premature as discovery is at an early stage. Defendants’ position perhaps would be clearer had the motion been made at a later stage in the litigation. Also, the February letter is but one agreement among others between the parties. These other agreements, the Purchase Agreement and the Employment Agreements, govern most of the terms of the exchange between the parties, and defendants’ position is that much of what they accepted from plaintiffs
 
 *DXLIII
 
 under the February letter was owed under the Purchase Agreement.
 
 [7]
 
 Defendants’ failure to explicitly affirm or disaffirm the contract reasonably consists with its position that the February letter is unenforceable and that plaintiffs already owed $17,183 million under the Purchase Agreement.
 

 For these reasons, the Court grants leave to defendants under Rule 15(a) to amend their pleadings, which currently appear only partially to make out a claim on the basis of their concealment allegations. Fed.R.Civ.P. 15(a) (“[Ljeave shall be freely given [to amend a pleading] when justice so requires.”). Defendants may choose to amend their pleadings as they see fit. The scope of the leave now granted by the Court, however, is limited to the request made by defendants. Defendants may amend their pleadings only to include allegations of a claim that, if proved, would render the February letter unenforceable. Defendants shall file and serve any amended pleadings within thirty days of the entry of this order.
 

 The Court therefore cannot determine on the current record whether the factual disputes raised by defendants, that is, the circumstances of the Eton transaction, its effect on Clarendon’s profitability, and whether plaintiffs concealed any of this information, are material to plaintiffs’ summary judgment motion. If defendants assert a counterclaim that, if proved, would render the February letter unenforceable, then any factual dispute material to that counterclaim likewise is material to plaintiffs’ summary judgment motion. If defendants cannot make out such a counterclaim, then the factual dispute is immaterial and does not preclude summary judgment. As noted above, plaintiffs already have forecasted that any such counterclaim will either face insurmountable legal hurdles, or will require defendants to return the $17,183 million indemnity payment. Plaintiffs’ summary judgment motion, however, provides no opportunity for defendants to respond to, or the Court to rule upon the accuracy of these forecasts. Accordingly, the Court denies plaintiffs’ motion for partial summary judgment, because a genuine issue of fact remains in dispute, and the materiality of that dispute is not ascertainable on the current record.
 

 Finally, as defendants’ appeals to the doctrines of equitable recoupment and set-off are rejected below, the Court now clarifies that only defendants’ allegations of fraud now preclude the Court from granting summary judgment in favor of plaintiffs on the 1999 Earnout. If defendants, for whatever reason, do not prevail on a counterclaim that would rescind or otherwise render the February letter unenforceable, then plaintiffs are permitted to renew their, motion for partial summary judgment on the 1999 Earnout based on the February letter.
 

 III.
 
 Genuine Issues of Fact Related to the Parties’ Indemnification Dispute Do not Preclude Summary Judgment
 

 Defendants also contend that the Court should deny summary judgment because factual issues remain in dispute about plaintiffs’ obligation to indemnify defendants under the general indemnification provisions of Purchase Agreement.
 
 [8]
 
 The
 
 *DXLIV
 
 parties are currently litigating an action in New York State Supreme Court to resolve the indemnification issues. Defendants claim that because factual issues remain in dispute with respect to the indemnification litigation, the Court should deny plaintiffs’ summary judgment motion in this action under the doctrines of equitable recoupment or setoff.
 
 [9]
 
 Plaintiffs reply that the doctrines of equitable recoupment and set-off do not apply in these circumstances, and thus present no bar to partial summary judgment.
 

 A.
 
 The Doctrines of Equitable Recoupment and Setoff
 

 The Second Circuit has described clearly and extensively the doctrines of equitable recoupment and setoff under New York law in three particular opinions,
 
 In re McMahon,
 
 129 F.3d 93 (2d Cir.1997),
 
 In re Malinowski,
 
 156 F.3d 131 (2d Cir.1998), and
 
 Westinghouse Credit Corp. v. D’Urso,
 
 278 F.3d 138 (2d Cir.2002). Equitable recoupment and setoff are substantively equivalent doctrines. The few distinctions between the doctrines make a difference primarily in bankruptcy actions, in which priority among creditors to the bankrupt entity often presents a pivotal, immediate issue.
 
 See In re McMahon,
 
 129 F.3d at 96 (citing, among other things,
 
 Reiter v. Cooper,
 
 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993));
 
 In re Peterson Distributing,
 
 82 F.3d 956, 959 (10th Cir.1996). A bankruptcy petition can trigger an automatic stay of actions against the bankrupt entity.
 
 See
 
 11 U.S.C. § 362. “The automatic stay generally prohibits creditors from obtaining possession of or otherwise burdening any property of a bankruptcy debtor without the permission of the bankruptcy court.”
 
 In re McMahon,
 
 129 F.3d at 96. Setoff claims are subject to bankruptcy’s automatic stay provision.
 
 Id.
 
 Thus a defendant to an action brought by a bankrupt entity may not improve its priority in the bankruptcy distribution by counterclaiming setoff. Recoupment, on the other hand, is not subject to the automatic stay provisions of 11 U.S.C. § 362, “because funds subject to recoupment are not the debtor’s property.”
 
 In re Malinowski,
 
 156 F.3d at 133;
 
 In re McMahon,
 
 129 F.3d at 96. Thus recoupment presumably offers a preferable doctrine to a creditor defending against an action brought by the bankrupt entity, because it permits the creditor potentially to skip ahead of other creditors if the recoupment doctrine applies.
 
 See, e.g., Westinghouse,
 
 278 F.3d at 148 (declining to apply recoupment because “doing so would give Seller an unbargained-for position superior to a secured creditor”).
 

 Apart from the distinct remedies offered by recoupment and setoff in the bankruptcy context, little of substance distinguishes the doctrines. “Recoupment is in the nature of a defense, the purpose of which is to do justice viewing one transaction as a
 
 *DXLV
 
 whole.”
 
 In re Malinowski,
 
 156 F.3d at 133. Under New York law,
 

 Recoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered. Of course, such a process does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole.
 

 In re McMahon,
 
 129 F.3d at 96 (quoting
 
 National Cash Register Co. v. Joseph,
 
 299 N.Y. 200, 86 N.E.2d 561, 562 (1949)). “In recoupment, ... the claim and counterclaim must arise out of the same transaction or set of transactions.”
 
 In re Malinowski,
 
 156 F.3d at 133;
 
 see In re McMahon,
 
 129 F.3d at 96. “[A] transaction may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.”
 
 In re Malinoivski,
 
 156 F.3d at 133. “When,” for example, “the circumstances, that gave rise to the credit and those giving rise to the creditor’s obligation to the debtor do not result from a set of reciprocal contractual obligations or from the same set of facts, they are not part of the same transaction.”
 
 Id.
 
 at 134. In the recoupment context, therefore, a Court must not isolate its scrutiny to the mere meaning of the word “transaction,” but must consider the “logical relationships” between the claim and counterclaim. In both
 
 In re Malinowski
 
 and
 
 Westinghouse,
 
 the Second Circuit held that the doctrine of equitable recoupment did not apply even when the obligations at issue arose out of the same contract. In
 
 In re Malinowski,
 
 the Court held that “Where the contract itself contemplates the business to be transacted as discrete and independent units, even claims predicated on a single contract will be ineligible for recoupment.” 156 F.3d at 135. And in
 
 Westinghouse,
 
 the Court found that “although the Agreement constitutes a single integrated transaction, it is one that comprises ‘discrete and independent units,’ ” and therefore applying the doctrine of recoupment would be inequitable. 278 F.3d at 148.
 

 Similarly, “the right of setoff allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.”
 
 In re Malinowski,
 
 156 F.3d at 133 (internal quotations omitted). “In setoff, the debts may arise from different transactions, but they must be mutual. Debts are mutual when they are due to and from the same persons in the same capacity.”
 
 Westinghouse,
 
 278 F.3d at 149 (internal quotations and citations omitted). Because debts must be due to the claimant for setoff to apply, “ ‘there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable.’ ”
 
 Willett v. Lincolnshire Mgmt.,
 
 302 A.D.2d 271, 756 N.Y.S.2d 9, 10 (1st Dep’t 2003) (quoting
 
 Spodek v. Park Prop. Dev. Assoc.,
 
 263 A.D.2d 478, 693 N.Y.S.2d 199, 200 (2d Dep’t 1999)).
 

 Generally, then, outside the bankruptcy context setoff and recoupment each basically provide a legal ground upon which a party can postpone paying a sum to another party until the net liability between the parties is finally determined.
 

 B.
 
 Neither Equitable Recoupment nor Setoff Precludes Summary Judgment
 

 Regardless of whether genuine issues of fact remain in dispute as to plain
 
 *DXLVI
 
 tiffs’ general indemnity obligations under Article 7 of the Purchase Agreement, these issues do not preclude summary judgment, because neither the doctrine of equitable recoupment nor of setoff applies to this case at its current stage.
 

 Equitable recoupment does not apply because the obligations arise out of discrete and independent units. Plaintiffs’ general indemnity obligations arise out of Article 7 of the Purchase Agreement. Defendants’ obligation to pay the 1999 Earn-out arises out of the February letter, the parties’ mutual understanding of which is based in part on the terms of Article 2 of the Purchase Agreement. Defendants suggest that these obligations arise under an “overall single transaction between the parties — namely, the acquisition of Lion by Hannover Re.” (Defendants’ Opposition, at 12.) Defendants’ characterization is reasonable, given that the February letter is not an isolated agreement, but rather one executed apparently in the midst of competing claims between the parties arising out of the Purchase Agreement and Employment Agreements. Defendants’ characterization also is arguable, given that, as plaintiffs point out, “the February letter does not merely recite that Plaintiffs’ qualified for the payments,” but rather memorializes a new agreement between the parties. (Plaintiffs’ Reply, at 19.)
 

 Defendants’ characterization, however, that the general indemnification provisions and the Earnout provisions are part of an overall single transaction, even if accurate, does not preclude summary judgment. The Earnout provision and the general indemnification provisions were transacted as discrete and independent units between the parties. The obligations refer to completely separate circumstances. They are not, in other words, “reciprocal,” nor do they arise “from the same set of facts.”
 
 In re Malinowski,
 
 156 F.3d at 134. Apart from their mutual coexistence in the lengthy, comprehensive Purchase Agreement, the obligation of the selling shareholders to indemnify Hannover Re and Hannover Re’s obligation to pay additional incentive compensation to Lion’s executives and selling shareholders for managing Clarendon profitably share no logical relationship. As in
 
 Westinghouse,
 
 the obligations here “are not in any way contingent on one another, and indeed are not even complementary.” 278 F.3d at 148.
 

 The indemnity provisions, in fact, implicitly disclaim any such contingency between the indemnity obligations and the Earnout provisions. The indemnity provisions in the Purchase Agreement specifically provide that funds for indemnification may be taken from, among other things, “any amount of Additional Incentive Compensation ... payable at such time or paid to Milo and Ferguson after the Closing Date,” and “from any amounts payable at such time or paid to Milo and Ferguson under Section 2.3 ... of this Agreement [the Earnout provision].” Defendants argue that this provision demonstrates that their obligation to pay the Earnouts enjoys some reciprocal relationship to plaintiffs’ obligation to indemnify. The quoted language demonstrates the opposite, however. It explicitly provides that plaintiffs may indemnify defendants with funds “paid” to it under the Earnout provisions. The indemnity provisions thereby implicitly disclaim any contingency between the payment of Earnouts and the payment of indemnity. As the obligations arise from discrete and independent units of the transaction, applying the doctrine of re-coupment would be inequitable, and the Court declines to do so.
 
 [10]
 

 
 *DXLVII
 
 Setoff likewise does not apply to prevent summary judgment at this phase. Obligations need not arise under the same “transaction” for setoff to apply. Obligations, however, must be due for setoff to apply. Here, no payments for indemnity to defendants are due from plaintiffs. The parties dispute plaintiffs’ obligation to indemnify defendants, and are litigating this dispute in New York State Supreme Court. Setoff therefore presents no bar to summary judgment at this stage.
 

 The Court therefore rejects defendants’ argument that disputed factual issues related to plaintiffs’ indemnity obligations preclude summary judgment. Neither equitable recoupment nor setoff precludes plaintiffs’ summary judgment motion.
 

 Conclusion
 

 For the reasons set forth above, plaintiffs’ motion for partial summary judgment is denied. Defendants are granted leave under Rule 15(a) of the Federal Rules of Civil Procedure to amend their answers in a manner consistent with this opinion and order, and must serve and file any such amended answers within thirty days of the entry of this order. In the event that defendants’ amended pleadings fail, for any reason, to prove a claim that would render the February letter unenforceable, plaintiffs are permitted to renew their motion for partial summary judgment.
 

 SO ORDERED.
 

 [1]
 

 . Clarendon Insurance Group, Inc. (“CIGI”), Clarendon National Insurance Co., and Clarendon America are apparently three separate companies, all somehow related to each other, to Lion, and to Hannover Re. The companies are each mentioned in the papers submitted to the Court. The parties do not clarify the relationship between these companies in their moving papers, and references in the briefs and supporting documents to companies named "Clarendon” are somewhat ten-ebrous on the current record. The parties do not, however, dispute that some company named Clarendon was a subsidiary of Lion, was operated by plaintiffs, and that its profitability for the years 1999-2001 is at issue. Plaintiffs refer to CIGI as the relevant company for the purposes of their motion. Defendants refer to "Clarendon” throughout their motion as a shorthand for the three companies collectively.
 

 For the purpose of this motion the uncertainty is, in any event, immaterial. The Court uses "Clarendon” throughout to refer to these companies, and need not distinguish between them for any pertinent point.
 

 [2]
 

 . According to the complaint, Milo LP is a Delaware limited partnership. Its general partner is Milo Investments, Inc., a Nevada corporation, and its limited partners are Philip Milo, Lucille Milo, Jennifer Milo, and Melissa Maundrell. (Compl., ¶3.) In their moving papers, plaintiffs state that plaintiff Ralph Milo is a principal of Milo LP. In this opinion, the term "plaintiffs” includes Milo and Milo LP, but reference to "Milo” and "Milo LP” refers to the separate plaintiffs in their respective capacities as officer and selling shareholder.
 

 [3]
 

 . According to defendants, the Combined Ratio is the ratio of losses plus certain expenses against premiums. (Defendants' Memorandum of Law in Opposition to Plaintiffs’ Motion for Partial Summary Judgment, at 4 n. 3 ("Defendants’ Opposition”).) Thus, the lower the Combined Ratio, the more profitable Clarendon performed in a given period. If Clarendon's Combined Ratio for a given period totals 75% or less, then the full Earnout for that period becomes due. (Defendants’ 56.1, ¶ 1; Haas Decl., ¶ 7.) If the Combined Ratio totaled between 75% and 80%, then a partial Earnout becomes due. (Haas Decl., ¶ 7.) If the Combined Ratio totaled 80% or more, then Hannover Re owed plaintiffs no Earn-out.
 
 (Id.)
 

 [4]
 

 . This alleged agreement is referred to below as the “Eton transaction.”
 

 [5]
 

 . Plaintiffs argue that even if the Purchase Agreement obligates them to pay $17,183 million, their agreement in the February letter to make the payment creates a new obligation, because at the time they contested whether the $17,183 million was due. In other words, because the parties disagreed about whether $17,183 million was due, plaintiffs gave something of value to defendants by making the payment immediately, prior to the resolution of the disagreement. While it need not rule on plaintiffs’ argument, the Court notes that plaintiffs do not cite case authority to support their position. Plaintiffs’ position, in any event, draws out the tension between two accepted principles of contract law. First, "[t]he law regards with favor, and seeks to uphold, settlements of pending or threatened litigations.”
 
 Wahl v. Barnum,
 
 116 N.Y. 87, 22 N.E. 280, 282 (1889). And second, "[a] promise to pay additional compensation for the performance by the promisee of a contract which the promisee is already under an obligation to the promisor to perform is without consideration.” C.J.S. Contracts § 122 (Research References).
 

 [6]
 

 . The record does not indicate whether Eaton Management, referred to in Ferguson’s Reply Affidavit, is the same as Eton Management, referred to in the submissions of Haas and Larrson. Given the context of the parties' dispute, the Court assumes at this time that the company referred to alternatively as "Eaton” and "Eton” is the same company.
 

 [7]
 

 . As noted above, the Court is in no position on this summary judgment motion to rule on whether the $17,183 million indemnity was due under the Purchase Agreement. Defendants' position that the February letter in-eludes no new obligations for plaintiffs, however, is incorrect.
 
 See supra.
 

 [8]
 

 . Plaintiffs' obligation to indemnify in this context refers to the general indemnification
 
 *DXLIV
 
 provision in the Purchase Agreement, not to the separate indemnification provision for losses related to the LMX business, discussed above.
 
 (See
 
 Defendants’ Opposition, at 5 n. 4.)
 

 [9]
 

 . Defendants' answers include a counterclaim for setoff. In their opposition papers to the current motion, defendants argue that equitable recoupment, not setoff, should prevent summary judgment, and, citing Rule 8(c) of the Federal Rules of Civil Procedure, ask the Court to treat the pleadings as if defendants had properly designated equitable recoupment as a defense. As the Court finds below that neither the doctrine of equitable recoupment nor setoff precludes summary judgment, any imprecision in defendants’ answers is moot. In any event, the Second Circuit has noted that denominating a defense as setoff is not necessarily fatal to the defendant's later effort to argue recoupment.
 
 See Westinghouse Credit Corp. v. D’Urso,
 
 278 F.3d 138, 145 n. 2 (2d Cir.2002).
 

 [10]
 

 . Defendants' reliance on
 
 Gateway Companies, Inc. v. OfficeMax, Inc.,
 
 176 F.Supp.2d
 
 *DXLVII
 
 211 (S.D.N.Y.2001), does not persuade the Court to rule differently. Defendants accurately state that in
 
 Gateway,
 
 "the only issue the court considered was whether the two claims arose from the same transaction,” and argue that “the existence of a recoupment defense has consistently been held to preclude summary judgment.” (Defendants’ Opposition, at 11, 12.)
 
 Westinghouse,
 
 decided by the Second Circuit roughly a month after the Court decided
 
 Gateway,
 
 interprets recoupment as a much more narrow doctrine than does
 
 Gateway. Gateway
 
 notwithstanding, New York law is clear on the doctrine of equitable recoupment and has been described repeatedly by the Second Circuit. Moreover,
 
 Enrico & Sons Contracting, Inc. v. Bridgemarket Assocs.,
 
 also relied upon by defendants, better explains the doctrine of re-coupment, and thereby demonstrates why defendants’ position here is distinguishable:
 

 We disagree with the motion court as to what the consequences of the assertion of the counterclaim should be in the context of plaintiff’s motion for partial summary judgment. The recoupment claim goes to the heart of the parties' bargain and, indeed, is akin to a defense of lack or failure of consideration. As such, it is inextricably linked to the issues underlying plaintiff's breach of contract claims, and its assertion, once permitted, ought to have precluded the grant of summary judgment as to those claims of contractual breach.
 

 252 A.D.2d 429, 675 N.Y.S.2d 351, 352 (1st Dep’t 1998) (citations omitted).